MADELINE DILLINER, Appellee, v. PATRICK H. JOYCE et al., Trustees, Appellants.

No. 46021.

NOVEMBER 17, 1942.

REHEARING DENIED APRIL 9, 1943.

Carr, Cox, Evans & Riley, of Des Moines, and Kenneth H. Davenport, of Creston, for appellants.

F. R. Curry, O. M. Slaymaker, R. E. Killmar, and D. D. Slaymaker, all of Osceola, for appellee.

MITCHELL, J.—Madeline Dilliner commenced this action at law against Patrick H. Joyce and Luther M. Walter, trustees of the Chicago Great Western Railroad Company, a corporation, to recover damages on account of an injury that she suffered when an automobile in which she was riding ran into the side of a Chicago Great Western train at a point north of Des Moines in Polk County, Iowa.

The defendants filed answer denying each and every material allegation. There was a trial, at which evidence was offered and at the close of the plaintiff's evidence the defendants made a motion for a directed verdict, which was overruled. The motion was renewed at the close of all of the evidence and again overruled. The jury returned a verdict in favor of the plaintiff in the amount of $3,000. Defendants, being dissatisfied, have appealed.

As the errors urged for reversal involve only the question of whether or not the lower court erred in overruling the motion for a directed verdict, we must examine this record with the rule in mind that the evidence is to be considered in the most favorable light for the appellee.

Joyce and Walter were trustees at the time of the accident in question, operating the Chicago Great Western Railroad Company. Madeline Dilliner was a young woman, twenty-five years of age. On the evening of February 10, 1940 (some places in the briefs and arguments the date is mentioned as February 10, 1941), she, with her husband and her small children, was

intending to go to Ames to remain overnight with her mother-in-law. She and her three children got into the automobile, a 1935 Ford V-8, at her home, at about 7:30 in the evening. The Great Western tracks ran catercornered two blocks north from where she lived and angled down across Broadway about a mile west of Norwoodville, on a slight angle north and south. The automobile was facing the Chicago Great Western tracks, and while sitting there she heard a freight train pass on these tracks. It was not until 8:00 o'clock that they started on their journey. Her husband owned and drove the automobile and she was riding as a guest. She had no management of or control over the automobile. They drove south on 29th Street, which is a street that runs in a northerly and southerly direction, heading into the city of Des Moines. It is a gravel road. When they reached what is known as Broadway Avenue they turned west. It was better than a mile from the place they turned to where the Great Western tracks cross Broadway Avenue where the accident occurred. While the street is referred to as Broadway Avenue, apparently it is nothing but a country road. The Great Western track crosses Broadway Avenue, the road upon which appellee and her husband were riding at the time of the accident, from north to south. The track north of the crossing turns to the east and the track south of the crossing turns to the east and this makes a horseshoe curve with the crossing in the toe of the horseshoe. As they drove west along what is referred to as Broadway Avenue, which was in reality nothing but a country road, the driver of the car, who is the husband of the appellee, testified that they were listening for whistles and bells and the noise of the train as they approached the railroad crossing; that his front lights were lighted and in good working order and he could see one hundred and fifty or two hundred feet ahead, and when he was not in smoke or fog he could see around three hundred feet. His tires were in good shape. It was hazy and foggy. The road was on a grade up to the railroad crossing. It was not such a grade that the lights went over the top of the railroad car, but instead the lights were shining underneath the railroad car all the time until they got within twenty-five feet of it. He was traveling at the rate

of between twenty and twenty-five miles an hour. There were ruts in the road, and also ice. He testified, however, that he could not have stopped his car even if he had not slid on the ice. The evidence shows that, although the driver and his wife were listening and looking all of the time, there appeared to be no obstacle ahead of them until they got within about twenty-five feet of the train. The driver immediately applied the brakes, which were in good condition, and he slid into the side of the refrigerator car which was standing still on the railroad track. The appellee was injured and it is for those injuries that she seeks damages in this case. The collision occurred five or ten minutes after 8:00 o'clock and it is the claim of the appellee that the train which they ran into was the train which she heard at 7:30 when she was sitting in the car waiting for her husband at their home, and that therefore there was evidence upon which the jury could have found that the train had been blocking the crossing from somewhere between thirty and forty minutes. There is also evidence of statements claimed to be made by members of the crew as to the length of time that the train was blocking the crossing.

Both the appellee and her husband were perfectly familiar with the crossing. She testified they traveled along this same road to go to town and that she went over it three or four times a week and her husband went over it almost every day; that she had been along there many times at night; and the husband, who was the driver of the car, testified that he had used the crossing a great many times; in fact, he testified that he was so familiar with it that he knew what the grade of the road was, and where it changed, and how it went up as it approached the railroad track, and that there were ruts in it.

Appellee contends that the appellants have waived the errors assigned because, in their brief and argument the assignment of error, the statement of where the erroneous ruling is to be found, is quoted from the motion made at the close of appellee's evidence, to wit, page 38, lines 6–12, and the ruling complained of, according to the appellee's brief and argument and also the appellants' brief and argument, is found on page 40, lines 40, 41. This, of course, is a mistake. It should be page 40,

lines 30, 31. This ruling was made at the end of appellee's evidence. Following this ruling the appellants offered testimony and then rested. The appellee offered rebuttal testimony. Appellants, the appellee said, do not complain in this division or any other division of their argument in regard to the ruling the trial court made at the end of the evidence overruling their motion for a directed verdict. The appellee calls our attention to the fact that we have held that if a defendant makes a motion for a directed verdict at the end of plaintiff's evidence, and then, when the same is overruled, he does not rely thereon but offers his own evidence, this waives the ruling made on such motion and it is necessary for the defendant to make a motion at the end of the evidence and rely on such motion if he wants to question the sufficiency of the evidence to sustain the verdict or again raise such question in a motion for a new trial. Commercial Credit Co. v. Hazel, 214 Iowa 213, 242 N. W. 47.

The record in the case at bar shows that the appellants made a motion for a directed verdict at the close of the appellee's testimony; that they set out the specific grounds upon which they urged the court to direct a verdict in their favor. This motion was overruled. Evidence was then offered by the appellants and rebuttal evidence by the appellee. At the close of all of the evidence, the appellants renewed their motion for a directed verdict. We quote from the record:

"Mr. Evans: Comes now the defendant at the close of all of the evidence and renews the motion that was made at the close of the plaintiff's evidence to direct a verdict in its favor, and specifically renews each ground thereof."

Thus we see that the appellants specifically renewed each and every ground of the original motion for a directed verdict. Certainly it was not necessary to clutter up the record by dictating into the same at the close of the evidence each and every one of the grounds relied upon for a directed verdict. It was necessary for the appellants to quote from the abstract at the place where the motion for directed verdict was first made, because that is the only place the grounds of the motion for a directed verdict are set out and that is the place where the ruling was also set out. The mere fact that they quote from

that part of the abstract it seems to us is immaterial. Appellants renewed the motion and specifically renewed each and every ground of same at the close of all of the testimony. The grounds for the directed verdict at the close of all of the evidence were automatically the same as at the time it was originally made at the close of appellee's testimony. The ruling was the same. Courts do not like to be technical. Courts should be anxious to see that technicalities are waived and all parties given a fair hearing. On this record we can come to no other conclusion than that the appellants did not waive the errors alleged and they properly protected their record.

The appellants contend that the lower court erred in overruling the first ground of their motion to direct a verdict, reading as follows: "The evidence fails to disclose any negligence on the part of defendants in that the undisputed evidence shows that the train with which the car in which plaintiff was riding collided was occupying the crossing at the time and place of the collision and the defendants were under no duty [with respect thereto] which the evidence shows had been breached" for the reason they were under no duty to give warning to travelers upon a highway of the presence of a train upon a crossing, claiming that the train itself is sufficient warning of its presence.

The appellants rely mainly on our holding in the case of Dolan v. Bremner, 220 Iowa 1143, 263 N. W. 798. The appellee answers by saying that case is not controlling here, that the case at bar is different, but if not different, the Dolan v. Bremner case is not good law and should not be longer followed. We shall first take up the manner in which the appellee claims that this case differs from the Dolan case. It is argued that in the Dolan case the accident happened near the town of Ackley while in the case at bar the accident happened in the country where one would not be expecting trains to be blocking the crossing. We cannot agree with the appellee in this regard. It seems to us that it is as binding in the country as in town, for, after all, a railroad car setting on a track at an intersection of a highway and railroad track is just as much a warning in the country as it is in town, and it must always be kept in mind that in this

case both the driver of the car and the appellee were familiar with the road that led up to the railroad crossing, with the railroad crossing itself, and with all of the surroundings. They used it practically every day and many times at night. In the Dolan case it is argued that the highway came downgrade as it approached the railroad crossing, and this would cause the light to shine on the standing car. In this case it is the contention of the appellee the crossing was approached on an upgrade and that this caused the lights to shine under the standing car. It is true that in the Dolan case there was a slope downward, but it was also claimed in that case that at a point approximately fifteen feet west of the tracks there was an incline. We quote from the Dolan case, at page 1147 of 220 Iowa, page 800 of 263 N. W.:

"Appellant's evidence tended to show that from a point a considerable distance west of the railroad crossing the highway sloped slightly downward toward the railroad crossing, this downward slope ending at a point approximately 15 feet west of the tracks, and that, from this point to the railroad tracks, there was a very slight incline of from 8 to 12 inches in the 15 feet."

In the case at bar the evidence of the civil engineer who made the measurements shows that two hundred feet east of the railroad crossing was the lowest point in the grade. That point is two feet seven inches below the top of the crossing. There is a four-inch rise in the next one hundred feet. From that point to the crossing there is a rise of two feet and three inches. Starting at this point one hundred feet from the crossing, there is a four-inch rise the first twenty-five feet. In the next twenty-five feet there is a seven-inch rise; in the third twenty-five feet there is a ten-inch rise; and in the last twenty-five feet there is a six-inch rise—a total of two feet three inches.

The driver of the car in which the appellee was riding testified that the lights of his car shone underneath the railroad car and on that account he was not able to see the railroad car until he reached a point approximately twenty-five feet from the crossing; that the fog on that night was hanging down just to the bottom of the refrigerator car which stood on the crossing.

In the Dolan case the fog went down to the ground. The answer seems to us to be, that knowing, as the appellee and her husband, the driver of the car, did, that they were about to cross a railroad track, knowing all the circumstances surrounding it, including the grade of the road, knowing it was foggy and hazy, it was their duty to approach that crossing at a speed that they would be able to stop rather than at a rate of between twenty and twenty-five miles an hour. It is also interesting to note that a car approaching from the other direction was able to see the freight car on the track and to stop before colliding with. it. It may be true that the conditions on the other side of the track were different from on this side. The record does not show. The record does show that the car approached and was able to see the freight car.

It is next urged by appellee that the railroad-crossing signal in the Dolan case was properly installed while in the present case it was very much out of repair. There is some evidence that the crossing signal, which was back some distance from the railroad track, was not in proper repair, but we do not believe that it is material in this case, because both the appellee and her husband, the driver of the car, testified that they knew where the crossing was and they had used it continuously for years.

The appellee quotes from the Dolan case as follows, at page 1146 of 220 Iowa, page 799 of 263 N. W.:

"It is the contention of the appellee, however, that the particular crossing in question is unusually dangerous, and that, in addition to the statutory sign, ordinary care on the part of the railroad company would have required other signs or warning signals to apprise the drivers of vehicles upon the highway of the presence of the railroad crossing. It may be conceded that, as contended by appellee, if a railroad crossing is unusually dangerous, a railroad company may be under obligation to install other warning signs or signals in addition to those required by statute. No general definition can be given as to what constitutes an unusually dangerous railroad crossing. Whether or not a railroad crossing is unusually dangerous must depend upon the facts in each particular case."

Appellee in the case at bar says the crossing was an unusu-

ally dangerous one. With this we cannot agree. The road was a gravel road. It was approximately twenty feet wide. True, there were trees along one side and there were snowbanks approximately three feet high, but the driver of the car in which appellee was riding was familiar with the entire condition of the road. The grade was not a dangerous one. We have set out the measurements made by the civil engineer. There was nothing to interfere with the vision of the driver looking straight ahead on this road.

We are inserting here a copy of Exhibit J, a photograph, which was offered by the appellee, and which was taken at a point two hundred feet east of the crossing, looking west, and shows the conditions as they were in February 1940, except for the snow and the lack of leaves:

It is claimed by the appellee, and there is evidence to support it, that the night was very dark, there were no stars or moon, it was very foggy and smoky. The gravel was a dirty, yellow-looking tan color. The railroad car that was blocking the crossing was a dirty, yellow refrigerator car, and its head trucks were south of the road and its back trucks were north of it and this allowed the light from an oncoming car to shine

under the refrigerator car. None of the railroad employees were present at the crossing to give any signal to those approaching the crossing. The railroad employees were all acquainted with the crossing. There had been a snow two or three days before the day appellee was injured and the snowplows had pushed the snow to the side of the road and this made banks two or three feet deep. It had melted during the day on February 10, 1940, and this had allowed water to run in the automobile wheel tracks so that this had frozen and was slippery as the car neared the railroad track. This court, in the Dolan case, it seems to us answered all of these contentions, wherein it said, at page 1148 of 220 Iowa, page 800 of 263 N. W.:

"Conceding that the appellee and the driver of the car in which she was riding may have been deceived by fog or mist overhanging the crossing, which because of the color of the railroad car made its presence on the crossing indiscernible in such fog or mist, we do not think there is anything in the evidence that would impose upon appellant the duty of anticipating that such a condition would exist, or that would impose upon appellant the duty of anticipating that appellee and the driver of the automobile in which she was riding would not, by the exercise of ordinary care, avoid the dangers incident to such a condition if it did exist. On the contrary, we think the railroad company would be justified in assuming that, if there was a mist or fog upon the highway, the driver of the car in which appellee was riding would reduce his speed so that he would not travel into or through such mist or fog at any greater rate of speed than would enable him to stop within the distance in which he could see objects ahead of him."

It is next contended that this case is different from the Dolan case in that the railroad company was not making reasonable and legitimate use of the crossing; that the crossing could have been cut or the train could have stopped north or south of the crossing; that the train had blocked the crossing between thirty and forty minutes without any of the trainmen coming to the crossing to put out lights or flares or give any warning signal. It is true there is evidence in the record from which the jury might have found that the crossing had been blocked

between thirty and forty minutes. This is specifically denied by each and every member of the train crew but there is a dispute in regard to the facts. In regard to the legitimate use of the crossing, the appellee's husband testifies, over objection, that a trainman told him shortly after the accident the train was stopped to pick up cars. It is also the testimony of another witness that some trainman had said that they were going to do some switching.

The trainmaster of this division was riding in the cupola of the caboose on the night that this accident occurred. He testified that he saw fire twenty or thirty cars from the caboose, around the wheels, and that he applied the brakes from the caboose by using the conductor's valve and brought the train gradually to a stop; that the train was more than a half mile long; that immediately after the train was stopped, the conductor, a man by the name of Welch, went to the back of the train to protect it. The brakeman and the trainmaster immediately started toward the engine to inspect the train to see what was the trouble with the same. From the head end of the train, a brakeman, who was riding in the cab of the engine, started back toward the rear of the train to ascertain why the train had been stopped. When they reached the crossing they found the Dilliner car had collided with a refrigerator car, which was twenty-three cars from the engine. The only other members of the train crew were the engineer and the fireman, who remained with their engine. All of the testimony of the train crew is that it was stopped because it was the belief that something was dragging and there was some trouble with the brakes. It is true that they did not find anything. There is no evidence in this record that any cars were picked up or that any switching was done. In fact, there is no evidence that if the train was stopped for the purpose of picking up cars or doing switching it was not a legitimate use of the railroad crossing, nor is there any evidence in the record, except the length of time that the train was there, that it was an unreasonable length of time that the company was using the crossing. Thus, as we read the record, there was no evidence upon which the court could submit to the jury the question of improper use of the crossing or an unreasonable length of time that the crossing was blocked, for cer-

tainly the train crew had a right to stop the train. Thus we find no material difference between the case at bar and the Dolan case. In fact, the distinguished trial judge who tried this case believed that the Dolan case was controlling but it was his judgment that the Dolan case should be overruled. We are aware of the fact that there are other courts that hold contrary to the Dolan case. Some of the following cases have language in them contrary to our views set out in the Dolan case: Richard v. Maine Cent. R. Co., 132 Maine 197, 168 A. 811, 812; Spiers v. Atlantic Coast Line R. Co., 174 S. C. 508, 178 S. E. 136.

But there are many courts that are in accord with our holding in the case. A great many of them are reviewed in the case of Sailors v. Lowden, 140 Neb. 206, 211, 299 N. W. 510, 512. We quote:

"We will now consider a few of the many legal questions involved. The train standing on the crossing was not a cause of the accident, but merely a condition making the accident possible. 'Presumably railroad maintaining statutory safeguards at crossings need keep no others, and traveler on highway has burden in action for injuries to prove special conditions requiring special protection.' McParlan v. Grand Trunk Western R. Co., 263 N. W. 734 (273 Mich. 527).

" 'A railroad company is not bound to give warning of the presence of a train on a highway crossing in the night, if a traveler on the highway could, by proper diligence, discover its presence by the aid of the lights on his machine.' Gallagher v. Montpelier & Wells River R. Co., 52 A. L. R. 744 (100 Vt. 299, 137 Atl. 207).

" 'A railroad company blocking a highway with a standing train at night has a right to assume that one driving an automobile along the highway will adopt such lights and rate of speed that he can bring his machine to a standstill within the distance that he can plainly see the obstruction, and therefore is not negligent in failing to give warning of the presence of the train.' Philadelphia & R. Ry. Co. v. Dillon, 15 A. L. R. 894 (1 W. W. Harr. [Del.] 247, 114 Atl. 62).

" 'In the absence of statutory requirements, the mere leaving of a train across a highway without lights or other signals to

disclose its presence is not per se negligent, and cannot be considered as the effective cause, but merely as the condition, of injuries resulting from a traveler upon the highway running against the train.' St. Louis-San Francisco Ry. Co. v. Guthrie, 56 A. L. R. 1110 (216 Ala. 613, 114 So. 215).

"Each of these last two cases is followed by annotations in the A. L. R., and the latest and most extensive notes are found in 99 A. L. R. 1454.

"In Pennsylvania R. Co. v. Huss, 96 Ind. App. 71, 180 N. E. 919, the Indiana court said: 'It would seem to be true that an object as large as a freight car would of itself, under ordinary conditions, be sufficient notice of its presence to warn any person using the highway with ordinary care that the highway was obstructed, and that it would not be necessary to have an employee present to call to the attention of travelers such fact.' See Trask v. Boston & Maine Railroad, 219 Mass. 410, 106 N. E. 1022; Morris v. Atlantic City R. Co., 100 N. J. Law, 328, 126 Atl. 295.

"It is suggested that, when an automobile truck is disabled, or stops at night on a highway, the law requires that the driver at once display flares at each end to warn the traffic.

"Our attention has not been called to any law which provides that, when a long freight is using a passing track, has stopped and the rear brakeman is coming right up to cut a highway crossing, prior thereto he must bring up flares and light them to warn passing motorists, for every driver knows, when he sees the large standard with the cross-arms, that a train may be standing on the railroad track, for that is the usual and ordinary plan of railroading, for freight trains must take the passing track to permit passing trains to move on schedule time.

"In the case of Coleman v. Chicago, B. & Q. R. Co., 5 N. E. (2d) 103 (287 Ill. App. 483), a verdict in the plaintiff's favor for $2,500 was set aside and a judgment was entered for the defendant. It was held by the court: 'To recover for injuries received when automobile in which he was riding struck freight car blocking highway crossing, automobile guest would be required to adduce evidence tending to prove that railroad company was negligent and that such negligence was proximate cause of his injury.'

"Another case closely in point is Mabray v. Union P. R. Co., 5 Fed. Supp. 397. In this case an experienced driver started home about 3 a. m. on November 7, 1932, on Brighton boulevard, leading out of the city of Denver, and collided with a freight train of stock cars so constructed that lights from the opposite side of the train could be easily visible to travelers on the other side. It was a dark night, and the vision was obscured by reason of snow and sleet, and it is alleged that the railroad company, knowing these conditions, failed to warn the traveling public of the danger existing across the highway. In this case it was said that courts have held that crossing signals are intended to protect the traveler from approaching trains, but that a train standing on a crossing is a sufficient warning to automobile drivers. The driver of the automobile and four of the guests with him each filed separate causes of action against the Union Pacific. Demurrers to each of the petitions were sustained."

This court as it is now composed does not desire to overrule the case of Dolan v. Bremner, 220 Iowa 1143, 263 N. W. 798. █ Not only do we believe there is no evidence of negligence in the case at bar, but, if there were, it would be insufficient to show that such negligence on the part of the railroad company was the proximate cause of the accident and injuries to the appellee. As we said in the Dolan case, at pages 1148, 1153 of 220 Iowa, page 800 of 263 N. W.:

"Even if it be conceded, however, that the evidence was such that it made a question for the jury as to the necessity of other and additional warning signs or signals, and, even if the appellant railroad company may have been negligent in that respect, we think the evidence insufficient to show that such negligence, if any, on the part of the railroad company was the proximate cause of the accident and injuries to the appellee. Railroad tracks necessarily cross public highways, and it is necessary that trains at times be stopped upon such public highway crossings. When this is done and the railroad company is making reasonable and legitimate use of such crossing, the presence of the train itself is sufficient warning to anyone using the highway, and there is no duty upon the part of the railroad

company to anticipate that one using the highway will not see such train and be apprised of its presence as fully as he would be if other signs or warnings were used. * * *

"We reach the conclusion, therefore, that there was no negligence proved on the part of the defendant railroad company that constituted the proximate cause of the accident and injuries for which recovery is sought in this action. In view of this conclusion, we deem it unnecessary to prolong this opinion by a discussion of other alleged errors."

It necessarily follows that the lower court erred in not sustaining the motion for a directed verdict and that this case must be, and it is, hereby—Reversed.

WENNERSTRUM, C. J., and HALE, SAGER, MILLER, and STIGER, JJ., concur.

BLISS, OLIVER, and GARFIELD, JJ., dissent.