456

OTTO F. MORELAND, ADMINISTRATOR, APPELLEE, V. CHICAGO
& NORTHWESTERN RAILWAY COMPANY ET AL.,
APPELLANTS.

FILED JULY 10, 1928.   No. 26068.

*Wymer Dressler, Robert D. Neely* and *Hugo J. Lutz,* for
appellants.

*James C. Quigley, Peterson & Devoe,* and *Good, Richard-
son & Good, contra.*

Heard before GOSS, C. J., ROSE, THOMPSON, EBERLY and
HOWELL, JJ., and BEGLEY and BROADY, District Judges.

BROADY, District Judge.

This case grows out of a collision at a highway cross-
ing between a passenger train and an automobile which

resulted in the death of Hubert Roy Moreland. The plaintiff, as administrator of the estate of the deceased, brings the action against the railroad company, and claims negligence on the part of the railroad company in .(1) that the train was, at the time, running at a high rate of speed in violation of an ordinance of the village within which the accident happened, and (2) that the railroad was negligent in that it failed to give any warning of the approaching train by either blowing the whistle or ringing the bell as required by law. The railroad company denies any negligence on its part, and claims that the deceased and the driver of the automobile, in which decedent was riding, were negligent in going upon the crossing without looking and listening within 100 feet of the crossing; and at the conclusion of the evidence moved for a directed verdict in favor of the defendants. This motion was overruled, and the case submitted to a jury, which returned a verdict in favor of the plaintiff in the sum of $33,000.

The accident occurred within the limits and on the outskirts of Crookston, a small village in Cherry county. The railroad runs approximately east and west and is the main line of the Northwestern from Council Bluffs, Iowa, to South Dakota and Wyoming. Moreland and Donald Ogilvie were partners in a general insurance agency, and, as such, jointly owned the automobile, bore the expenses equally and divided the income of the business in equal shares, and on the date of the accident were engaged in this business, and traveling in a Ford coupé. Ogilvie was driving the car and sitting on the left side, Moreland on the right side, of the seat. They were coming from the west paralleling the railroad, and at a point approximately a quarter of a mile south of Crookston turned north and approached the village at right angles to the railroad track. From this point both could and did see the railroad tracks. Both were familiar with the crossing, as they had traveled this road on previous occasions. As the automobile turned to the north towards town, the road descends somewhat and crosses a bridge across a small creek. Immediately

to the right of the bridge were small trees and growing brush, which at the time were bare of foliage, as the accident occurred early in March. The bridge was 239 feet south of the railroad crossing, and from this point there was a clear and unobstructed view of the railroad for a distance of approximately 1,000 feet east; where the track runs through a cut in an embankment or small hillside. There is a clear, unobstructed view of the tracks from the crossing to this cut. To the left of the crossing, approaching from the south, is an unobstructed view of the track for some 300 feet, where the section-house in which the track-worker lives is located. Beyond that, to the west, are the usual railroad station, or depot, elevators and other buildings usually found around railroad yards in a small town. The highway was of a deep sand surface, and at a point approximately 100 feet south of the crossing is up-grade to the track level. The last 35 or 40 feet the road ascends rather abruptly.

Ogilvie said that just after crossing the bridge, 200 feet south of the track, he looked in both directions and could see no train approaching from the east, but did see a freight train with engine attached headed east, standing approximately 100 feet west of the highway crossing. Ogilvie did not again look to the east, but kept his attention directed to the freight train to ascertain whether or not it was going to start moving. He said the engine, though standing still, was emitting steam in considerable quantities, and he thought it was about to start. The freight was standing on a side track, waiting for the passenger coming from the east to pass. The track was elevated above the level of the highway, and Ogilvie said he could not see whether the freight was on the main track or side track. Ogilvie says that he did not look east after a point 100 feet south of the crossing, but gave his attention to the freight train and to the driving of the car through the sandy roadway, and the up-grade approaching the tracks, but says that he kept listening for any warning of an approaching train, of a whistle or sounding of a

bell, and heard none. He says that Moreland, the deceased, was also listening for any approaching train, and, at a point between 80 and 100 feet south of the crossing, looked east, at least twice, and said to Ogilvie, "Everything is clear on my side," and from then on both kept looking at the freight train and did not look to the east.

On cross-examination Ogilvie said that his watching of the freight did not, however, prevent his looking to the east at any time, and that he could have stopped the car almost instantly, as it was traveling only from four to six miles an hour. He also said that, at a point something over 100 feet south of the track, he had practically stopped the automobile and then ran in low gear. As the rear end of the automobile passed over the track it was struck by a passenger train coming from the east. The automobile was demolished and Moreland fatally injured and died shortly thereafter. Ogilvie, apparently, was uninjured.

Plaintiff contends that the position of the freight train, standing to the left of the crossing, was such a circumstance as to direct and divert the attention of the occupants of the automobile and excuse their not looking to the right after they had left a point between 80 to 100 feet south of the crossing, and claims that the passenger train was coming at a high rate of speed in violation of the city ordinance, which limited the operation of railroad trains within the village to 10 miles an hour; and also claims that the failure of the engineer to sound the warning whistle or bell was the proximate cause of the accident. The ordinance of the village does limit the operation of trains within its territory to not exceed 10 miles an hour. The defendants claim that this ordinance is void, being an unreasonable restriction in the necessary operation of such trains; claims that both the whistle and the bell were sounded and ringing continuously from the point of the cut in the embankment, or 1,000 feet east of the crossing. The engineer says that he sounded the whistle at the mile post east of the station and that he kept the whistle blowing from that point until the accident happened. Several

other witnesses stated that they heard the whistle, but differed as to the number and kind of sounds made by the whistle. Some of these witnesses were in the depot 300 or 400 feet west of the crossing. Others were residents of the village and were at different points from the tracks. The fireman corroborates the engineer both as to the question of whistling and ringing the bell. Both say that the engineer had set the mechanism which rang the bell by air and that the bell was ringing continuously prior to and until after the accident. Both the engineer and fireman say that, after the accident and after the train had stopped, the engineer directed the fireman to shut off the air from the bell cord, and that the bell was ringing until that time. This is corroborated by at least one other witness. Ogilvie says that he and Moreland were both listening and did not hear either the bell or whistle. To quote Ogilvie's direct testimony as to his listening after he crossed the bridge, he said: "We were both listening at all times for a train from the east as well as the west." But he did not look, and a mere glance to the east would have disclosed the coming train. It is the duty of one approaching a railroad crossing to look as well as listen. Several witnesses called by the plaintiff testified that they did not hear either the whistle or bell, and some of them said that they were in a position so that they could have heard the bell or whistle had either of them sounded. It is the duty of a railroad train in approaching a crossing to give warning of its approach by blowing the whistle and sounding the bell continuously from a point 80 rods from a crossing. *Campbell v. Union P. R. Co.*, 100 Neb. 375. The evidence upon the question of warning is conflicting, and upon that question, standing alone, it would be a question for the jury.

It must be taken as undisputed that the train was at the time running in excess of 30 miles an hour, at least. The engineer says that at the time the accident happened he was running from 30 to 35 miles an hour, and that he had partially set the brakes, some distance east of the cross-

ing, preparatory to stopping at the station. Ogilvie said, and it is undisputed, that after he crossed the bridge and was approaching the track he was running the automobile about 5 miles an hour, and that as he approached the incline, or upward grade over the right of way, he increased his speed a little, due to the incline and the heavy sand roadway. The day was clear and dry with no wind blowing and the road dry and in good condition other than it was up-grade approaching the track and a heavy sand surface.

The engineer, on the right or north side of the engine cab, did not see the automobile approaching from the south. The fireman sitting on the left, or south side of the cab, saw the automobile approaching, but says it was running slowly, and he thought the driver saw the train and was stopping, but that when starting up the incline to the track the automobile speeded up somewhat. He then feared a collision and called to warn the engineer, but that because of the noise of the blowing whistle and ringing bell the engineer could not hear him, and that he, the fireman, then started across the cab to warn the engineer. At that moment the accident occurred. The engineer said that he could have stopped the train within 400 or 500 feet, and when it did stop the engine was almost even with the depot, and that he, the engineer, ran back to the injured Moreland, whom he asked if he did not see the train, and that Moreland said: "Yes; but it was too late." A woman who had run out of the depot said that Moreland made the same statement to her.

The principal question is whether or not Moreland was himself guilty of negligence which was either the cause of or which contributed to the accident and which would bar recovery even though the defendant was negligent. This question must be determined under the comparative negligence statute of this state, which is that, even though the defendant was negligent, the plaintiff could not recover if he himself were guilty of more than slight negligence as compared to any negligence of the defendant, or if the

defendant was guilty of less than gross negligence as compared with the negligence of plaintiff's decedent. We concede that the question of contributory negligence is for the jury, unless it cannot be said that reasonable minds would differ on this question.

The plaintiff contends that the presence of the freight train was a diverting circumstance sufficient to excuse the occupants of the automobile from looking at a point closer to the crossing than they did look, and that the question of contributory negligence, if any, was a question for the jury, and by their verdict the jury determined that question in favor of the plaintiff.

"It is the duty of a traveler on a highway, when approaching a railroad crossing, to look and listen for the approach of trains. He must look, where, by looking, he could see, and listen, where, by listening, he could hear; and if he fails without reasonable excuse to exercise such precautions he is guilty of negligence." *Askey v. Chicago, B. & Q. R. Co.*, 101 Neb. 266; *Morris v. Chicago, B. & Q. R. Co.*, 101 Neb. 479; *Haffke v. Missouri P. R. Co.*, 110 Neb. 125.

"Failure of the railroad company to ring the bell or blow the whistle as the train approached the crossing, even though it may have been negligent, would not make the railroad company liable for the death of the automobile driver in a collision at the crossing, if he recklessly failed and neglected to have his car under control and by looking and listening at the proper time and place could have seen the approaching train in time to stop before reaching the track, but recklessly failed and neglected to do so, whereby there was a collision." *Askey v. Chicago, B. & Q. R. Co.*, 101 Neb. 266.

The *Morris* case, supra, holds that the plaintiff could not recover if he himself were negligent, even though no signal by bell or whistle was given by the appproaching train. In the *Haffke* case, supra, it is held that, where it shows beyond a reasonable dispute that the plaintiff's negligence was more than slight as compared with the neg-

ligence of the defendant, it is the province of the court to direct a verdict for the defendant. See, also, *Tyson v. Missouri P. R. Co.,* 113 Neb. 504.

In the *Haffke* case the court say: "We think it may well be conceded that the evidence with respect to the negligence of the defendant is sufficient to have that issue submitted to the jury, but the question upon which the case must turn is whether the plaintiff was guilty of such contributory negligence as to defeat recovery." In sustaining a directed verdict for the company in that case, the court say: "A mere glance occupying but a fraction of a second would have sufficed to warn him (plaintiff) of the approaching train."

Moreland and Ogilvie were unquestionably engaged in a joint enterprise so that the negligence of either one would be attributable to the other. We think it was the duty of both Ogilvie and Moreland to look eastward at a point closer to the crossing than 80 or 100 feet, as testified was the point at which either last looked. Had either done so, they could not have helped but see this approaching train and could have stopped the automobile within 3 or 4 feet at the most. At a point 50 feet from the crossing one could have seen the track and approaching train for a distance of over 1,000 feet. We do not think any reasonable mind could differ upon this question.

Plaintiff insists that the fact of the standing freight train and the locomotive headed toward the crossing 100 feet away constituted a "diverting circumstance" sufficient to justify both Ogilvie, the driver of the car, and Moreland giving it all their attention, thus excusing their failure to look to the east after passing a point 80 feet from the crossing. As was said in *Hall v. Union P. R. Co.,* 113 Neb. 9: "There may be circumstances which will excuse his (plaintiff's) failure *for a brief period* to look *in every such direction,* and if he suffers injury thereby, his negligence, if any, is ordinarily a question of fact for the determination of a jury." Where, however, such circumstances do exist, it is the duty of such traveler to exert greater

care before crossing the track, unless prevented by some fault of the railroad company. He should use alertness and vigilance before he has taken a position exposing himself to peril or has come within the zone of danger, so that his precaution may be effective. The diverting circumstances must be a condition of reasonably eminent danger to himself and occurring at a point which to ignore could fairly be said to expose him to a perilous position from that cause alone. It cannot be held that an object or condition which arouses curiosity, not dangerous, would excuse caution to guard against another obviously dangerous situation. If the freight train had been moving it would have been sheer recklessness to attempt to cross ahead of it. If it was standing still there could be no danger in crossing. It was standing still and Moreland and Ogilvie both knew it. A mere glance to the right by either, at any point within 50 feet of the crossing, would have disclosed the oncoming train. Both Ogilvie and Moreland were negligent in a degree far more than slight, and even conceding the passenger train was exceeding its speed limit and not sounding the whistle or bell, the contributory negligence of the plaintiff equalled, if not exceeded, any negligence of defendant.

We are not unmindful that members of a court may not, from the very nature of their position, view the circumstances of a particular case as would persons engaged in other avocations, and for that reason are loath to say that a state of facts is not sufficient to support the findings of the jury. But when the undisputed circumstances are too clear and one-sided to say otherwise, it becomes the duty of the court to say, as a matter of law, that there is no negligence, or that the plaintiff was guilty of contributory negligence of more than a slight degree. That is the situation in this case. It is the duty of this court to reverse the decision in this case.

The physical conditions surrounding the scene of this terrible accident are fixed and permanent and are conclusive, and under the plaintiff's own evidence he could not

recover. Therefore, the judgment is reversed and the case dismissed.

REVERSED AND DISMISSED.