PAULINE SAILORS, APPELLEE, V. FRANK O. LOWDEN ET AL., TRUSTEES, APPELLANTS.

299 N. W. 510

FILED JULY 25, 1941. No. 31027.

*Chambers, Holland & Locke,* for appellants.

*Eugene D. O'Sullivan* and *L. R. Doyle, contra.*

Heard before SIMMONS, C. J., ROSE, EBERLY, PAINE, CARTER and MESSMORE, JJ.

PAINE, J.

This is an action for damages for personal injuries suffered by the plaintiff when the automobile of which she was the owner, but in which she was riding as a guest, collided with a standing freight train at a highway crossing in Havelock. Ten members of the jury returned a verdict in the sum of $1,750, for which amount a judgment was entered. The plaintiff filed a motion, setting out 14 errors committed by the court, and asking for a new trial, and on the same day the defendants also filed a motion for a new trial, setting out 34 errors for reversal. The trial court overruled both motions for new trial. Notice of appeal was filed by the attorneys for the defendants.

The plaintiff's evidence discloses that the plaintiff, Mrs. Pauline Sailors, was 28 years of age at the time of the trial, and is a waitress in the café in the Union Pacific depot in Omaha. She had been separated from her husband, who was living in California and not supporting her. Exhibit No. 1 was an assignment from her husband to her of any claim which he might have because of this accident to his wife.

Plaintiff testified that at the time of the accident she lived with her mother, and had been acquainted with Clyde.

O. Severs for about four or five months. Severs came to her about 10:30 p. m. on the night of the accident and told her that he wanted to apply for a job which required him to use a car, and wanted to borrow her car for two or three days until he could arrange for another if he got this job as a cigarette salesman. Mrs. Sailors loaned him her Ford coupé, and then proposed that she go to Lincoln for the ride, and would come back the next day by bus or train, as she did not have to go to work until 1 o'clock the next afternoon.

They started for Lincoln, Mr. Severs driving the car, and stopped at Ashland and had coffee at a café. It was a very, very cold night. Mrs. Sailors had recently had the Ford equipped with an electric plate defroster on the windshield on the driver's side, and she could not see out of her side of the windshield at all, as it was frosted over. She did not know that they were approaching a railroad track until they struck the stock car, and she was seriously injured. She cannot remember much about it, except her legs were numb, and she suffered pain in her head, and the blood was running down her face. Some of her teeth were knocked out, and she had bruises and cuts on her face. Dr. Czar Johnson bandaged her injuries at the hospital, where she remained for some eight days, X-rays being taken at the St. Elizabeth Hospital by Dr. Kail.

Clyde O. Severs testified that he had lived in Lincoln for 20 years; that he was 38 years of age, had been traveling for Thomas L. Dawson Construction Company of Kansas City; that during part of the winter of 1936 and 1937 he worked for Browning & King in Omaha, during which time he became acquainted with the plaintiff. The accident happened at Touzalin avenue in the south side of Havelock, a suburb of Lincoln, and Severs testified that he was very well acquainted with this crossing, for he drove a milk wagon, drawn by horses, across it daily in 1930 and 1931, and described the three sets of tracks at this Rock Island crossing on Touzalin avenue, and told how the road went up an incline from the switch track on the north side to the main line track.

The testimony of the defendants' witnesses was that this accident occurred at 1:35 to 1:40 a. m., January 10, 1937. A through train from Texas, consisting of 38 cars of stock and five other cars, was run as an extra freight, pulled by one of the largest engines, X2558. This east-bound train had orders to take the passing track at Havelock, to allow west-bound passenger train No. 7, which was several hours late, to pass it there.

As this east-bound stock train reached the west end switch to the passing track, the head brakeman opened the switch and got back on the engine, and the train slowly pulled into the passing track. When the rear of the caboose reached the west end switch, the rear brakeman got off, and the train pulled on down a short way to clear the switch, and then stopped, and the rear brakeman threw the switch and then threw his electric lantern light on the switch-points to see that they were set properly against the stop-rail, so the passenger train could safely go through at regular speed.

The rear brakeman then started down the middle of the main line track, which was some ten feet to the north of the passing track, for the purpose of cutting the train to open Touzalin avenue to the highway traffic. When he was within about one and a half car lengths from the crossing, there being only four cars and the caboose standing west of this crossing, he saw this automobile crash into the side of stock car No. 73612.

The automobile wedged itself under the freight car, with its radiator smashed, while the rear of the automobile reached back far enough to block the main line track, and the brakeman and the driver, Severs, could not pull it out. The conductor coming down from the caboose, Mr. Calder, the rear brakeman, called to him to bring the red lantern, fusees, and torpedoes to stop the passenger train, expected any moment. The conductor brought them, and when the brakeman had taken these down the track about a block or more he could see that, with the help of others who had driven up, the conductor had pulled the auto back from under the stock car, and the main line track being now

cleared he did not put out the signals, but came back to the little depot, on the east side of Touzalin avenue and just north of the main line track, and called the Lincoln agent and reported the accident, and told him to send out an ambulance and police. The accident was reported to the dispatcher at Fairbury at 1:52 a. m., according to the dispatcher's record sheet in evidence. The brakman then woke up the attendant in the depot and had him build a fire, and soon the plaintiff was brought into this depot, from which place she and the driver of her automobile were taken by ambulance to St. Elizabeth Hospital at about 2:30 a. m. The passenger train, No. 7, came through at about 2:15 a. m.

The fireman on the engine of the stock train testified that, looking back up the track, he saw the rear brakeman, Calder, coming down the track with his white lantern to uncouple the cars, and saw the automobile run into the side of the train, showing that, while it was a very cold night, some 15 degrees below zero, the visibility was clear enough for the fireman to see back nearly the full length of a 43-car train, the stock cars being 36 feet in length, and a few of the other cars being 40-foot cars.

At this point Touzalin avenue consists of 70 feet of parking in the middle and two narrow brick-paved roads on each side, one for north-bound and the other for south-bound traffic, the brick paving being 18 feet wide in each, according to the measurements of Arthur J. Whalen, who testified there was a street light to the north 180 feet 6 inches, and also a street light on the south side of the crossing. He gave the distance between the nearest rail of the passing track to the nearest rail of the main line track as eight feet five inches.

This automobile first crossed the switch track, which loops out to the north from the main line to serve an elevator, coal yards, and other commercial purposes, this switch track being some 60 feet north of the main line track. Close to the switch track there was the required tall standard, with cross-arms, indicating to any driver that he was about

to cross railroad tracks. The two red lights, or electric wig-wags, were lower down on this same standard, but could only be operated by a train on the main line.

To the south of the main line was the long passing track, with a capacity of 50 to 55 freight cars, which passing track served no commercial uses at all. The very purpose of this long passing track, parallel with and close to the main line track, was for a freight train to stand there while a passenger train could safely pass it in either direction. This is the only plan and method devised for the handling of slow and fast traffic on the same line.

We will now consider a few of the many legal questions involved. The train standing on the crossing was not a cause of the accident, but merely a condition making the accident possible. "Presumably railroad maintaining statutory safeguards at crossings need keep no others, and traveler on highway has burden in action for injuries to prove special conditions requiring special protection." *McParlan v. Grand Trunk Western R. Co.*, 263 N. W. 734 (273 Mich. 527).

"A railroad company is not bound to give warning of the presence of a train on a highway crossing in the night, if a traveler on the highway could, by proper diligence, discover its presence by the aid of the lights on his machine." *Gallagher v. Montpelier & Wells River R. Co.*, 52 A. L. R. 744 (100 Vt. 299, 137 Atl. 207).

"A railroad company blocking a highway with a standing train at night has a right to assume that one driving an automobile along the highway will adopt such lights and rate of speed that he can bring his machine to a standstill within the distance that he can plainly see the obstruction, and therefore is not negligent in failing to give warning of the presence of the train." *Philadelphia & R. Ry. Co. v. Dillon*, 15 A. L. R. 894 (1 W. W. Harr. [Del.] 247, 114 Atl. 62).

"In the absence of statutory requirements, the mere leaving of a train across a highway without lights or other signals to disclose its presence is not *per se* negligent, and

cannot be considered as the effective cause, but merely as the condition, of injuries resulting from a traveler upon the highway running against the train." *St. Louis-San Francisco Ry. Co. v. Guthrie,* 56 A. L. R. 1110 (216 Ala. 613, 114 So. 215).

Each of these last two cases is followed by annotations in the A. L. R., and the latest and most extensive notes are found in 99 A. L. R. 1454.

In *Pennsylvania R. Co. v. Huss,* 96 Ind. App. 71, 180 N. E. 919, the Indiana court said: "It would seem to be true that an object as large as a freight car would of itself, under ordinary conditions, be sufficient notice of its presence to warn any person using the highway with ordinary care that the highway was obstructed, and that it would not be necessary to have an employee present to call to the attention of travelers such fact." See *Trask v. Boston & Maine Railroad,* 219 Mass. 410, 106 N. E. 1022; *Morris v. Atlantic City R. Co.,* 100 N. J. Law, 328, 126 Atl. 295.

It is suggested that, when an automobile truck is disabled, or stops at night on a highway, the law requires that the driver at once display flares at each end to warn the traffic.

Our attention has not been called to any law which provides that, when a long freight is using a passing track, has stopped and the rear brakeman is coming right up to cut a highway crossing, prior thereto he must bring up flares and light them to warn passing motorists, for every driver knows, when he sees the large standard with the cross-arms, that a train may be standing on the railroad track, for that is the usual and ordinary plan of railroading, for freight trains must take the passing track to permit passing trains to move on schedule time.

In the case of *Coleman v. Chicago, B. & Q. R. Co.,* 5 N. E. (2d) 103 (287 Ill. App. 483), a verdict in the plaintiff's favor for $2,500 was set aside and a judgment was entered for the defendant. It was held by the court: "To recover for injuries received when automobile in which he was riding struck freight car blocking highway crossing, automobile guest would be required to adduce evidence tending

to prove that railroad company was negligent and that such negligence was proximate cause of his injury."

Another case closely in point is *Mabray v. Union P. R. Co.*, 5 Fed. Supp. 397. In this case an experienced driver started home about 3 a. m. on November 7, 1932, on Brighton boulevard, leading out of the city of Denver, and collided with a freight train of stock cars so constructed that lights from the opposite side of the train could be easily visible to travelers on the other side. It was a dark night, and the vision was obscured by reason of snow and sleet, and it is alleged that the railroad company, knowing these conditions, failed to warn the traveling public of the danger existing across the highway. In this case it was said that courts have held that crossing signals are intended to protect the traveler from approaching trains, but that a train standing on a crossing is a sufficient warning to automobile drivers. The driver of the automobile and four of the guests with him each filed separate causes of action against the Union Pacific. Demurrers to each of the petitions were sustained.

In *Megan v. Stevens*, 91 Fed. (2d) 419, 113 A. L. R. 992, this was an appeal from Iowa to the court of appeals for the eighth circuit before Judges Stone, Sanborn and Thomas. A freight car was standing upon a grade crossing, where highway No. 10 crossed the Chicago & Northwestern railroad line at Dumont, Iowa. The accident happened at 9:30 at night, January 28, 1936, and visibility was affected by falling snow. The crossing had been blocked four or five minutes to perform certain switching operations. An experienced driver was at the wheel, and testified he saw the train when he was distant 50 to 75 feet from the crossing, and put on his brakes immediately, but because of the ice under the snow he skidded into the train. The case was submitted to a jury, and a portion of the court's charge reads as follows: "Now, Gentlemen, I charge you that a railway company has the right, in its reasonable and ordinary course of business, and under proper conditions, to stop its trains upon crossings at highways, even though it blocks traffic

and temporarily excludes the use of the highway over the crossing by those traveling thereon. I further charge you that a railway company is not obliged under the law to maintain flagmen or watchmen or install signal devices, under all conditions, at ordinary highway crossings, even though such highway be an arterial one. On the other hand, railway companies or those operating railways, in using their tracks at points crossing arterial highways in cities and towns, should consider the time and circumstances of stops at such crossings, including weather conditions, and avoid unnecessary blocking of the highway at times when such use would be likely to endanger the lives of the traveling public upon the highway, and in such circumstances those operating railways should refrain from blocking such highways for an unreasonable length of time."

The case just reviewed was retried by Judge Scott of the United States district court for the northern district of Iowa, and brought to the circuit court of appeals again as *Thomson v. Stevens,* 106 Fed. (2d) 739, and was heard by Judges Gardner, Sanborn and Woodrough, the opinion being written by Judge Sanborn. Upon retrial of the case, the plaintiff again prevailed, and for the second time the judgment was reversed, it being held that the defendant company had the right to occupy this crossing for legitimate business purposes; that there was no evidence which would justify the conclusion that the train crew had caused the crossing to be unnecessarily obstructed. It is held: "Under Iowa law, a railway's trustee was not liable for death of guest in automobile which collided with freight car standing, without any warning, on highway crossing at night, where there was no evidence that train crew had caused crossing to be unnecessarily obstructed, and automobile driver's vision was obscured by a sudden flurry of snow."

In *Probert v. Chicago, I. & L. Ry. Co.,* 93 Fed. (2d) 259, when an automobile ran into a caboose the driver was killed. The plaintiff, sitting on the front seat, had a Boston bull dog on his lap, and said he was trying to make him more comfortable at the time of the accident, and was not concerned

in the driving of the car and paid no attention to it, that he had implicit faith in his brother's driving. It is said: "Any negligence on the part of the driver cannot be imputed to appellant, but it cannot be said that, because he was a gratuitous passenger, he was relieved from the exercise of ordinary care for his own safety. Even though he may have exercised ordinary care for his own safety, if the proximate cause of the accident was the negligence of the driver of the automobile, he cannot recover."

The verdict was returned in the case at bar on February 17, 1940, and on July 12, 1940, this court released the opinion in the case of *Fischer v. Megan,* 138 Neb. 420, 293 N. W. 287, so the trial court and counsel did not have the benefit of that opinion in the trial of this case in the district court.

This case is very closely in point with the case at bar. Herman J. Fischer, the deceased, whose widow, Kathryn Fischer, brought suit against the trustees of the Chicago & Northwestern Railway Company, was riding from St. Edward in the cab of a cattle truck, with a driver whom he had never met until this occasion, and at the Rivett siding near Maple street, Omaha, the cattle truck ran into a freight train standing still on the main line, and Fischer was instantly killed. The accident occurred at 1:05 a. m., November 27, 1934. It was a dark, cloudy, rainy, foggy night. The negligence charged was in blocking the highway without placing a trainman there to give a warning by signal lights, flares, torches, or other means. The jury returned a verdict of $25,000.

It was held by this court that, if the plaintiff does not make a case for negligence, it is error to submit that issue to the jury; second, that a motorist who drives his automobile so fast on a highway at night that he cannot stop in time to avoid a collision with an object within the area lighted by his headlights is negligent as a matter of law (*Redwelski v. Omaha & C. B. Street R. Co.,* 137 Neb. 681, 290 N. W. 904); and, third: "Evidence *held* insufficient to sustain a verdict for plaintiff in an action to recover dam-

ages for alleged negligence of a railroad company in blocking, without proper signals, a public street with a freight car, where a truck driver negligently ran his truck into the freight car at night and thus killed his guest passenger, for whose death the action was instituted."

In our opinion, the facts are practically the same as in the case at bar, for an automobile ran into a standing freight train in the nighttime, and somewhat similar charges of negligence were made. This court held that no actionable negligence of the defendant was shown, therefore there was nothing to submit to the jury, and the motion for a directed verdict should have been sustained.

We have reached the same conclusion in the case at bar. The motion made by the defendants for a directed verdict at the close of all the evidence gave the following reasons: (1) The evidence is insufficient to establish negligence on the part of defendants, which was the proximate cause of the accident; (2) the evidence conclusively established that plaintiff, through her agent, was guilty of more than slight negligence contributing to the collision; (3) the evidence was insufficient to sustain a verdict in favor of the plaintiff and against the defendant trustees.

For error of the trial court in not sustaining this motion, the judgment is hereby

REVERSED.