MILK HOUSE CHEESE CORPORATION, A CORPORATION, APPELLANT, V. CHICAGO, BURLINGTON & QUINCY RAILROAD COMPANY, A CORPORATION, APPELLEE.

73 N. W. 2d 679

Filed December 16, 1955.   No. 33783.

*Baylor, Evnen & Baylor* and *Warren K. Urbom,* for appellant.

*Jean B. Cain, Joseph C. Reavis, J. W. Weingarten,* and *W. P. Loomis,* for appellee.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

MESSMORE, J.

This is an action at law brought by the Milk House Cheese Corporation, plaintiff, against the Chicago, Burlington & Quincy Railroad Company, a corporation, defendant, in the district court for Richardson County to recover damages to plaintiff's 1951 International L-200 tractor and a 1950 Trailmobile trailer hereinafter referred to as plaintiff's truck, or truck, or trailer, as occasion requires, in a collision between such truck and a train owned and operated by defendant. The case proceeded to trial before a jury. At the conclusion of all of the evidence the defendant moved for a directed verdict for the reason that the evidence was insufficient on which to base a cause of action against the defendant, and for the further reason that the evidence showed plaintiff's driver to be guilty of contributory negligence such as to bar any recovery against the defendant as a

matter of law. The trial court sustained the motion. From the overruling of the motion for new trial filed by the plaintiff, the plaintiff appeals.

Insofar as necessary to consider here, the plaintiff's petition alleged damages to plaintiff's truck proximately resulting from negligence on the part of the defendant. We summarize the charges of negligence as follows: The defendant was negligent in failing to keep a proper lookout, to see plaintiff's truck, to stop the train, slacken its speed, or otherwise avoid the collision; in failing to have its locomotive under reasonable control; in running the train at a greater speed than was reasonable and proper under the existing conditions; in failing to ring a bell or sound a whistle between a point 80 rods from the crossing to the crossing as a warning of an approaching train; in failing to have the headlight on the locomotive operating; and in failing to have the automatic signals and gates at the crossing constructed and operating so as to give warning of the approach of the train on the passing track.

The defendant's answer denied the allegations of negligence set forth in the plaintiff's petition, and alleged that the collision was caused by the negligence of the driver of plaintiff's truck who could and should have seen the approaching train in time to have avoided the collision with it, but who failed to properly look and listen for approaching trains, failed to see and hear the train, failed to have his truck under proper control, and failed to stop the truck or avoid a collision, but drove the truck onto the track immediately in front of the train; and that the negligence of the plaintiff was more than slight in comparison with any negligence on the part of the defendant.

The defendant filed a cross-petition which was dismissed.

The plaintiff's reply to defendant's answer in effect denied the affirmative allegations of negligence contained in the defendant's answer.

The established rule is that: "A motion for a directed verdict must for the purpose of decision thereon be treated as an admission of the truth of all material and relevant evidence submitted on behalf of the party against whom the motion is directed. Such party is entitled to have every controverted fact resolved in his favor, and to have the benefit of every inference that can reasonably be deduced from the evidence." McIntosh v. Union P. R. R. Co., 146 Neb. 844, 22 N. W. 2d 179. See, also, Loudy v. Union P. R. R. Co., 146 Neb. 676, 21 N. W. 2d 431.

In addition to the foregoing rule, it is necessary to bear in mind that: "Where the facts adduced to sustain an issue are such that reasonable minds can draw but one conclusion therefrom, it is the duty of the court to decide the question, as a matter of law, rather than submit it to a jury for determination." Loudy v. Union P. R. R. Co., supra.

The record shows that U. S. Highway No. 75 runs north and south across the defendant's railroad tracks through Dawson, Nebraska. It is paved with concrete, 21 feet in width, and is practically level from some distance north of the defendant's railroad crossing and across the same. The defendant's tracks run east and west through Dawson. The main line track is the north track. The track about 10 feet south of the main line track is the passing track. The third track, approximately 40 feet south of the south rail of the passing track, is the industry track. The east end of the depot is 80 feet west of the west edge of Highway No. 75, and there is an outhouse 180 feet west of the west edge of the highway. There is a yellow railroad crossing sign on the highway approximately 400 feet north of the north rail of the main line.

The defendant, with the approval of the Department of Roads and Irrigation and the Bureau of Public Roads of the federal government, constructed a crossing signal at Dawson consisting of automatic gates and lights,

that is, a flashing-light signal with a short arm gate for southbound traffic on the north side of the main line about 15 feet west of the highway and about the same distance north of the north rail of the main line. There is also the same type of signal 15 feet south of the industry track and about the same distance east of the east edge of the pavement of the highway. When a train is on the main line approaching the crossing it operates the signal circuit of the crossing equipment. These approach circuits on the main line are governed by the speed of the train so as to operate the signals at a sufficient time in advance of the arrival of a train at the crossing, and continue to operate until the train reaches or is at the opposite side of the crossing when the signal automatically shuts off. The distance at which a train on the main line actuates the signals is about 1,810 feet. On the passing track, siding, or industry track a center section only is placed at such points as Dawson, and the same type of signal is used throughout the defendant's railroad system. The reason for this is because there are considerable switching movements, trains are broken up on these tracks, and they sit for long periods of time and at various times, which is not the case on the main line. Movements on switch tracks are slow. If there was an approach section on the passing track at Dawson the gates would be down all the time that trains were switching.

The plaintiff owned and operated a 1951 model L-200 International tractor and a 1950 Trailmobile trailer. At the time of the collision, at about 2 p. m., on March 7, 1952, this unit was driven by its employee James H. Moore. The truck was in first-class condition. The length of the tractor and trailer was 44 feet 10 inches. There were six wheels on the tractor and eight on the trailer. The weight of the tractor was about 9,500 to 10,000 pounds. The trailer weighed 11,000 pounds. The gross weight of the cargo of cheese was 33,800 pounds.

The locomotive was silver in color, trimmed in red, and

approximately 70 feet in length. The total length of the engine and five cars attached thereto was approximately 400 feet, or a little more.

The crossing signals met all the rules and regulations that govern the same, and there was no change in this respect at the time of the collision on March 7, 1952, nor was the signal equipment out of repair.

The driver of the truck, an employee of the plaintiff, testified that he picked up a cargo of cheese at Greenwood, Wisconsin, and proceeded toward San Antonio, Texas. He stopped overnight at Tama, Iowa, and left there about 6 a. m., the morning of the collision. The day was cloudy and cold. A little way north of Nebraska City it turned colder and started to snow. When he reached Dawson it was snowing hard. He was driving at 20 to 25 miles an hour until he approached within 200 feet of the railroad track where he slowed to 15 miles an hour. He was familiar with the highway, having been over it several times, and knew he was approaching a railroad track. He had noticed the railroad crossing sign approximately 400 feet north of the railroad track. He testified that he had no reason to know what time a train would come along. As he approached the railroad track it was snowing harder, it was dark, the wind was blowing, and "you couldn't see very far, or too far." The highway was slick and wet. He began to slow down to look for a train so he could stop in case there was one coming. The window on the driver's side of the truck was half-way down. He kept watching in both directions from a distance of 200 feet. He did not hear a bell, or the rumble of a train, or a whistle. No signals were in operation, nor were there any lights in operation. The motor of the truck was running quietly. The highway ran a little down hill at that particular place and he had his foot on the brake, holding the truck back. He knew the signal gates were there before he got to the tracks, but he did not believe he could see the gates or the lights before he got within 100 feet of the tracks. When

he got up to the gates, they were standing upright. The lights did not flash, nor did the gates start to come down. The signals were not working, so he started across the tracks and did not see the train until the front wheels of the tractor were on the main line track. At that time he saw the train coming from just behind the depot 75 to 100 feet away. There was no light on the locomotive. When he saw the train he pulled his truck to the left, changed to a lower gear, and tried to beat the train by getting the truck across the track the train was on. The train hit the front part of the front axle on the right, or west, side of the trailer. After the collision the rear of the trailer was pushed to the left 20 feet. The tractor was right under the signal lights on the south side of the tracks. The hood of the tractor was under the signal arm. He was putting on his over-shoes when the signal arm came down and hit the hood of the truck. When the locomotive stopped, the baggage car and half of another car were past the east edge of the crossing. The train struck the truck approximately 30 feet from its front end. On cross-examination he testified he saw the train when the front wheels of the truck got onto the main line track. The front of the train was coming out from behind the depot. At that time he was 125 feet from that particular corner of the depot. He estimated the speed of the train at 30 miles an hour. Driving at a speed of 20 miles an hour, he could stop the truck in 30 to 35 feet. It would take longer on wet roads. He could not stop when he first saw the train for the reason that the truck was on the main line track 12 or 14 feet from where the train was on the passing track. Instead of stopping, he stepped on the gas to try and beat the train across the crossing.

A witness testified that he was driving his automobile at 20 miles an hour, 35 to 50 feet behind the plaintiff's truck, and slowed down as he neared the railroad track. There was a heavy, wet snow that day; and visibility was poor, it was only good for about 300 feet. A train

came into his view when the locomotive, or the front of the train, was about 50 feet from the highway. He did not hear a bell or whistle, or any kind of warning from the train. The signal cross-arms were up, no lights were flashing, and he did not see a headlight on the locomotive. The rear end of the truck was struck by the train. When the train stopped, immediately after the accident, almost all of the locomotive was across the highway. The truck stopped on the other side of the crossing, with the tractor up against the signal on that side. On cross-examination he testified that the train stopped where it usually did, the same as if there had been no accident. Neither the truck nor the train was going very fast. He doubted if the truck could stop, he was too far along.

A witness who farms near Dawson was driving his truck from the south to the north on Highway U. S. No. 75. He was watching and listening for a train. He saw the train involved in the collision when he heard a noise and the wreck happened. It was snowing. He could see for a distance of from 100 to 150 feet. When he first saw the train he was about 150 feet south of the railroad tracks. He heard the whistle when the train "came around the curve." At that time he was about a quarter of a mile south of the tracks and the sound was coming from the northwest. It did not sound plain because it was snowing. He supposed the train was half a mile west at that time. He did not hear any sound after that, such as a bell or whistle, nor did he see a headlight on the locomotive or the flash of red lights or signals.

The station agent testified that he was standing at the window watching for train No. 42 as it came from the west, as he had orders for the crew. He first saw the train at the switch at the end of the passing track, a distance of approximately 2,000 feet west of the depot. He saw the train enter the side track. It was snowing very little. The train moved to in front of

the depot at a speed of 2 or 3 miles an hour, and came to a stop at the same place it usually stopped to unload mail and express and also discharge and receive passengers. He handed the orders to the fireman who sits on the left side of the cab. He further testified that after the impact, the front of the locomotive was about 15 feet across the crossing. The coaches were a little to the west of the depot for the reason that to the front of the train were the baggage and express cars and the coaches were behind these cars. The coaches were a dark green color.

The engineer who operated the locomotive at the time of the collision testified that he had orders to stop the train at Dawson to meet train No. 41 westbound, and to take the siding. To do so, the train stopped at the west passing track switch and when the switch was thrown moved into the siding, when the switch was closed the train moved to the depot. He estimated the switch to be about 3,000 feet from the depot. He sounded the crossing whistle before taking the siding, and when the train was about to the depot the whistle was blowing. The bell rang continuously, it was automatic. The engineer sits on the right side of the cab. As the train approached the highway crossing, he noticed a truck coming down the hill. The train was quite a distance from the depot at that time. He looked across a field north of the depot and saw the truck north of the railroad crossing sign which is approximately 400 feet north of the tracks. It was snowing a little, and the snow melted as soon as it hit the ground. He had no difficulty in seeing the truck. The train was moving about 10 miles an hour, preparing to make its regular stop with its front end 8 or 10 feet over the highway crossing on the east side thereof. He saw the truck just before the train stopped. He stated: "It just popped right in front of me like that." When he saw the truck before the train entered the crossing, the truck was on the main line track. He

was unable to observe its speed due to his position in the cab. When he saw the truck before the train hit it, he set the air brakes, but it was too late. He got out of the locomotive and looked at the front end of it. He could see no snow on the ground. The headlight of the locomotive was on at that time and the bell was ringing. He went over to talk to the truck driver who had stepped out of the cab of the truck, and asked him if he was hurt, and he said "No." "And then I says, 'What's the matter with you, don't you have no respect for railroad crossings when you come to them?' And he says, 'I seen you coming, but I thought I could beat you across.'" The engineer then went back to the locomotive, got inside, and shut off the bell. He further testified that immediately before the impact the train was moving 4 or 5 miles an hour, and that speed was gradually reduced until the train came to a full stop. On cross-examination he testified he set the brakes at about the time of the impact. Normally he would not have set them as hard as he did. He was blowing the whistle when the train entered the crossing and when he saw the truck at the time it came up on the track ahead of the locomotive. He then let go of the whistle and grabbed the brake valve.

The fireman testified that when the train arrived at Dawson it moved onto the passing track which he estimated to be about 1,800 feet west of the depot. No sound of the whistle was given at that time, but the bell was ringing. It was "spitting snow" which melted when it reached the ground. When the train proceeded on the passing track to the depot, it was moving at a speed of about 10 miles an hour. During that time the whistle was blown two long, one short, and two long blasts before the train got to the crossing. It was sounded at the required distance west of the depot. As the train was moving into the station, he could see the truck at a distance of 400 or 500 feet, moving at a speed of about 35 miles an hour. The last time he saw

the truck its speed was about 20 miles an hour. After the impact he left the locomotive and inspected it. The bell was ringing at all times until the engineer shut it off after the impact. There was no snow on the crossing, and it was not slippery. On cross-examination he testified that the train was 700 or 800 feet west of the depot when he first saw the truck 400 or 500 feet north of the crossing. The second time he saw the truck was when the train hit the back end of it. The last sound of the whistle is given at the crossing.

The conductor testified that the train consisted of a Diesel locomotive and five cars. The train stopped at the west switch about 1,800 to 2,000 feet from the depot to take the siding. It was snowing off and on at times, a light snow, and no drifts. As the train left the switch on the passing track, it traveled at a speed of from 8 to 12 miles an hour. When the train stopped, the locomotive was just beyond the crossing, the head car was close to the crossing, and the coaches were in front of the depot.

The expressman on the train testified that the train stopped at the west switch to go onto the passing track. He opened the door of the express car to get ready for station work. At that time it was snowing "a little bit." He was standing in the door on the north side of the train from the time the train was at the west switch until it got to the depot. The train was moving at a speed of 5, 7, or 8 miles an hour when it got onto the passing track to make the stop at the Dawson depot. He heard the whistle blow, that is when the expressmen get ready to do station work. He saw the truck on the highway north of the railroad sign, coming down hill, and at that time the train was west of the outhouse. He had no difficulty in seeing the truck, and watched it until the train got to the depot, then the depot obstructed his view. He estimated the speed of the truck at the time he saw it at 25 miles an hour. When the train reached the other side of the depot, he observed the driver of

the truck seemed to apply his brakes and then let them off. The truck at that time was 200 or 300 feet north of the track and "then he just shot out there like that." He stepped back from the door as he knew the train was going to hit the truck. He was in the third car back of the locomotive. On cross-examination he testified that when the train was at the depot the truck was 200 or 300 feet away.

The flagman testified that when the train approached the switch west of Dawson it headed onto the passing track and stopped to pick him up after he closed the switch. It is approximately 1,800 to 1,900 feet from the depot to the switch. On the passing track the train moved at a speed of 10 miles an hour, or a little better. It was snowing, but there was no snow on the ground and not enough falling to interfere with vision. He could see 3,000 or 4,000 feet and see train No. 41 approaching from the east when he was standing on the main line. He went up to the pavement after the impact, and testified it could have been damp, but it was not wet, there was no snow on it, and the paving would not have been hard to drive on.

A deputy sheriff of Richardson County testified that he arrived at the scene of the accident about 35 or 40 minutes after it happened. He had a conversation with the truck driver who said he did not stop at the crossing. He further testified that visibility was good, and he estimated that he could see a distance of 400 or 500 feet.

A captain of the Nebraska Safety Patrol testified to the distance in which a motor vehicle could be stopped at certain speeds under the conditions existing at the time of the accident, taking into consideration the reaction time, which would indicate the application of brakes. The evidence in the instant case discloses that the driver of the plaintiff's truck, by changing to a lower gear, attempted to pass in front of the train and clear the crossing before the train passed, and there is no

evidence that he applied his brakes at that time. Therefore, under the evidence adduced, the evidence of this witness has little application here.

There is no evidence that the highway had any ice or snow on it to make it slippery. What snow fell about the time of the accident melted as soon as it reached the ground or pavement, and did not accumulate.

The plaintiff assigns as error the following: (1) The trial court erred in sustaining defendant's motion for a directed verdict. (2) The trial court erred in failing to submit to the jury the issue of the defendant's negligence. (3) The trial court erred in holding that the plaintiff as a matter of law was guilty of contributory negligence barring its recovery. Other assignments of error relate to the above and will not be set out.

The following authorities are applicable, under the facts and circumstances, to the instant case.

If the operator of a motor vehicle is familiar with a railroad crossing and the surrounding conditions, it is his duty in approaching it to look and listen at a time and place where looking and listening will be effective even though vision of the railroad track is restricted. See Kennedy v. Chicago, R. I. & P. R. R. Co., 156 Neb. 345, 56 N. W. 2d 446.

It is the duty of the driver of a motor vehicle to have it under such control that when he arrives at a place while traveling toward a railroad crossing where it is possible to see and to hear an approaching train he can stop and avoid a collision with it. See Kennedy v. Chicago, R. I. & P. R. R. Co., *supra*.

It is the duty of a traveler on a highway, when approaching a railroad crossing, to look and listen for the approach of trains. He must look, where, by looking, he could see, and listen, where, by listening, he could hear, and if he fails without reasonable excuse to exercise such precautions, then he is guilty of contributory negligence more than slight, as a matter of law, and no recovery can be had for damages result-

ing from a collision with a passing train. McIntosh v. Union P. R. R. Co., *supra*.

In Rickert v. Union P. R. R. Co., 100 Neb. 304, 160 N. W. 86, it was held that a traveler upon a public highway, who attempts to cross a railroad track in front of an approaching train, if he knew, or ought to have known, of its approach, is guilty of contributory negligence which will prevent a recovery for resulting damages, if the approaching train was in such close proximity to the crossing that a reasonably prudent person could not fairly expect to cross in safety ahead of it. Cases adhering to this principle are, Eggeling v. Chicago, R. I. & P. Ry. Co., 119 Neb. 229, 228 N. W. 361; Haffke v. Missouri P. R. R. Corp., 110 Neb. 125, 193 N. W. 257; Askey v. Chicago, B. & Q. R. R. Co., 101 Neb. 266, 162 N. W. 647; Moreland v. Chicago & N. W. Ry. Co., 117 Neb. 456, 220 N. W. 692; Mundt v. Chicago, R. I. & P. R. R. Co., 136 Neb. 478, 286 N. W. 691; Loudy v. Union P. R. R. Co., *supra*.

The evidence adduced by the plaintiff with reference to not hearing a bell or whistle of the approaching train prior to the time of the collision between the train and the truck is not sufficient to overcome the evidence of reliable and competent witnesses that a bell was ringing and a whistle blowing.

Considering the positive testimony of the defendant's witnesses on the question of the ringing of the bell and blowing of the whistle, in the case of Nanfito v. Chicago, B. & Q. R. R. Co., 103 Neb. 577, 173 N. W. 575, it is said: "The testimony of witnesses, who were near the place of the accident at the time, that they did not hear the bell, without further explanation, is not sufficient to overcome positive evidence of reliable and competent witnesses that the bell was ringing." See, also, Tsiampras v. Union P. R. R. Co., 104 Neb. 205, 176 N. W. 366.

Even assuming, for the purposes of argument only, that the plaintiff adduced competent evidence that the

engineer did not blow the whistle on the train for the crossing or that the bell was not ringing as required by statute, the cases of Askey v. Chicago, B. & Q. R. R. Co., *supra;* Moreland v. Chicago & N. W. Ry. Co., *supra;* Mundt v. Chicago, R. I. & P. R. R. Co., *supra;* and Loudy v. Union P. R. R. Co., *supra,* are authority for the rule that where it is undisputed that a traveler on a highway failed to exercise reasonable precautions by looking and listening at a reasonable point where he could have seen an approaching train in time to stop before reaching the tracks, his negligence, as a matter of law, will defeat a recovery for damages resulting from a collision with a train at a crossing, even though no signal by the locomotive bell or whistle was given as required by law.

Failure of defendant's locomotive engineer to ring the bell or blow the whistle as the train approached the crossing, even though it may have been negligent, would not make the railroad company liable for damages to a motor vehicle in a collision at the crossing, if the driver of the motor vehicle recklessly failed and neglected to have his motor vehicle under control and by looking and listening at the proper time and place could have seen the approaching train in time to stop before reaching the track, but recklessly failed and neglected to do so, whereby there was a collision. See Askey v. Chicago, B. & Q. R. R. Co., *supra.*

Section 74-583, R. R. S. 1943, provides for the equipment to be used on locomotives in this state in the form of a headlight, and designates the power and visibility of the headlight. The visibility required by the statute is intended to be measured by and under ordinary night conditions, and for the sight of a person having usual visual capacity, and does not apply to engines that may be used exclusively between sunrise and sunset. The collision in the instant case occurred at about 2 p. m. Under the statute there was no specific duty on the part of the defendant to have the headlight

on its locomotive lighted at this time of the day. There is no evidence that a headlight on the locomotive would have made the train visible any sooner, or that it would have given any additional warning of the approach of the train. However, the evidence discloses that the headlight of the locomotive was on. The testimony contra is that the plaintiff's witnesses did not see it.

Apparently the plaintiff's driver contends that the failure of the wigwag signals to operate at the crossing to give him warning of the approach of a train on defendant's crossing justified him in assuming that it was safe to cross the tracks without further precaution.

In this connection, section 39-729, R. R. S. 1943, provided that in order to further promote safety, power is conferred upon the Department of Roads and Irrigation to devise warning signals and to erect and maintain them at railroad crossings where they intersect highways. In conformance with this section of the statutes, warning signals were erected at the highway crossing in question.

In connection with the effect of warning signals as the same apply to a driver of a motor vehicle approaching a railroad crossing, the following cases are applicable.

The case of Miller v. Pennsylvania R. R. Co., 299 Pa. 63, 149 A. 85, is similar to the instant case with reference to the location of the tracks, the crossing, the flash signals, and the depot. There was a flashlight signal west of the main line which did not operate for train movements on side tracks. In the opinion the court said: "Railroads may provide lights or gates for the protection of those crossing, but their presence does not excuse one passing who fails to exercise due precaution for his own safety: Zotter v. L. V. R. R. Co., 280 Pa. 14; O'Neill v. Reading Company, 296 Pa. 319."

In Wabash Ry. Co. v. Huelsmann, 290 F. 165, it is said that generally, a person who drives a motor vehicle on a railroad track at a highway crossing in front of an approaching train, which he could have seen, had he

looked, or could have heard, had he listened, is in law guilty of contributory negligence, and cannot recover damages from the railroad company. Neither open gates nor failure of the railway company to give signals at a railway crossing relieves one about to cross the tracks from the duty to use due care to look and listen for an approaching train.

In Calloway v. Pennsylvania R. R. Co., 62 F. 2d 27, at the point where the accident occurred, two tracks of the defendant crossed the street, a main line track and a switch track. The two tracks were parallel and very close together. Automatic electric signal lights were maintained at the crossing by the defendant, but these lights were connected with the main track only and not with the switch. In this respect the signal arrangement was somewhat analogous to the case at bar. The court said: " 'Neither open gates nor failure of the railway company to give signals at a railway crossing relieves one about to cross the tracks from the duty to use due care to look and listen for an approaching train.' Atchison, T. & S. F. R. Co. v. McNulty (C. C. A.) 285 F. 97, 100, certiorari denied 262 U. S. 746, 43 S. Ct. 521, 67 L. Ed. 1212." See, also, Union P. R. R. Co. v. Rosewater, 157 F. 168, 15 L. R. A. N. S. 803, 13 Ann. Cas. 851; Delaware, L. & W. R. R. Co. v. Welshman, 229 F. 82, L. R. A. 1916E 816; Lang v. Byram, 35 F. 2d 489.

In Johnson v. Union P. R. R. Co., 157 Kan. 633, 143 P. 2d 630, referring to Jacobs v. Railway Co., 97 Kan. 247, 154 P. 1023, L. R. A 1916D 783, Ann. Cas. 1918D 384, where the failure of an electric signal bell at a railroad crossing was the basis of the negligence charged against the railway company, and because of that negligence plaintiff claimed exemption from his own amenability to the rule of contributory negligence barring recovery, the court said: " '* * * the failure of an electric bell to ring does not relieve one about to cross a railroad track of the imperative duty to look and listen

before crossing. If he fails to do so, he is guilty of such contributory negligence as will prevent his recovery for any injuries sustained, and there is nothing to submit to the jury.' "

The fact that the accident happened as it did indicates either that the truck driver failed to look and observe the approaching train, or, having seen it, decided to take the chances of an attempt to cross ahead of it. In either case he was negligent and there can be no recovery.

The only reasonable deduction that can be drawn from the evidence is that the driver of the plaintiff's truck either did not look toward the approaching train at a place where a view could have been had a reasonable distance down the track, or, if he did look at such a place, no heed was given to the oncoming train, until it was too late to avoid the accident, and the conduct of the driver of the truck was negligence as a matter of law.

The plaintiff made other contentions, the consideration of which we deem unnecessary to a determination of this appeal, therefore the same will not be discussed.

We conclude that the trial court did not err in sustaining the defendant's motion for a directed verdict.

AFFIRMED.