HAROLD H. THOMAS AND GARY AESOPH, DOING BUSINESS
AS AESOPH & SONS CONSTRUCTION, APPELLANTS, V.
BURLINGTON NORTHERN RAILROAD, INC., A
CORPORATION, APPELLEE.

279 N W. 2d 369

Filed May 22, 1979. No. 42208.

Marc J. Weinpel of Peetz, Peetz & Weinpel and James W. Ellison of Holtorf, Hansen, Kovarik & Nuttleman, P.C., for appellants.

Martin, Mattoon, Matzke & Mattoon, for appellee.

Heard before BOSLAUGH, BRODKEY, CLINTON, and HASTINGS, JJ., and BARTU, District Judge.

BOSLAUGH, J.

The plaintiff, Harold H. Thomas, was injured in a truck-train collision on July 15, 1974, while employed by Gary Aesoph, doing business as H. J. Aesoph & Sons Construction. The plaintiff was operating a dump truck loaded with wet concrete when the truck collided with a freight train of the defendant, Burlington Northern Railroad, Inc., at a temporary grade crossing near Sidney, Nebraska.

At the time the accident occurred the interstate highway west of Sidney, Nebraska, was being constructed. Western Contracting Corporation was the principal contractor. Gary Aesoph was a subcontractor hired by Western to do the trucking on the job.

The interstate highway bridge over the railroad was under construction but had not been completed. The plaintiff was hauling a truckload of concrete from the mixing plant which was several miles west of the railroad crossing to a point east of the crossing where the paving was being laid. To get from the mixing plant to the point where the paving was in process, the plaintiff drove along the interstate grade to a point west of the bridge which was under construction. The plaintiff then made a left turn and drove down the side of the fill near the bridge site. The plaintiff then followed a "haul road" which crossed the railroad track at grade at a 90-degree angle approximately 400 feet north of the interstate bridge site. The haul road then turned to the south and rejoined the interstate grade a short distance east of the bridge.

On July 15, 1974, the plaintiff came to work at about 6 a.m., and had hauled 10 or 12 loads of concrete before the accident happened. At about 3 p.m., he left the mixing plant with a load of wet concrete. When he reached the point west of the bridge where he turned left off of the interstate grade he put the truck in low gear. The truck went down the grade at between 5 and 7 miles per hour and he continued at that speed until he reached the crossing and started across the tracks.

As the plaintiff's truck approached the grade crossing from the west, a freight train consisting of 7 locomotives, 110 empty coal hopper cars and a caboose approached the crossing from the south at a speed of approximately 32 miles per hour. The train

was about 1¼ miles long and weighed about 5,650 tons.

The plaintiff testified that he did not stop at the crossing or look for approaching trains and did not see the train before the collision. The front of the locomotive struck the right side of the truck behind the cab.

The engineer who was operating the locomotive, Jacob J. Sewald, testified that he was looking straight ahead and did not see the truck until just before the impact. He placed the train's air brakes in "emergency" at about the time the impact occurred and the train stopped between ¼ and ½ mile north of the crossing.

This action was commenced by the plaintiff and Aesoph to recover damages for the injuries sustained by the plaintiff in the accident and the damages to the Aesoph truck which was destroyed in the accident. The defendant counterclaimed for the damages sustained by two of its locomotives in the accident.

At the close of the evidence the trial court found as a matter of law that the plaintiff was guilty of contributory negligence which was more than slight and dismissed the petition. The case was submitted on the cross-petition of the defendant and the jury returned a verdict for the defendant in the amount of $12,000.

The plaintiff and Aesoph have appealed. The assignments of error relate to the dismissal of the plaintiff's petition at the close of the evidence; the admission into evidence of photographs of the scene of the accident; and the instructions to the jury.

The photographs in question were taken by Darrell McCall, a claims representative of the defendant, on the morning after the accident. McCall testified in detail as to how the photographs were taken and an adequate foundation for the admission of the photographs was shown. Generally a photograph is ad-

missible if it is relevant and is shown to be a true and correct representation of the place or subject it purports to represent at a time pertinent to the inquiry. Markey v. Hunter, 170 Neb. 472, 103 N. W. 2d 221.

The photographs were taken from the center of the haul road at distances of 25, 50, 75, 100, and 125 feet west of the crossing and show the view from the crossing to the interstate bridge south of the crossing. The photographs were relevant because they established without question that there was no obstruction to the plaintiff's view of the train as he approached the crossing, and if the plaintiff had made the slightest effort to maintain a lookout he would have seen the train in time to avoid the collision.

The plaintiff claimed the photographs were inaccurate because they did not contain a view of the area to the left of the crossing. Since the train approached from the south and the plaintiff approached the crossing from the west, a view of the area to the left of the crossing would not have been relevant.

The plaintiff further objected to the photographs on the ground they had been "edited." The photographs were a series of still shots taken by turning the camera from left to right so that the pictures in each series would form a panoramic view of the area shown in the photographs. At the time the photographs were offered in evidence, the pictures in each series had been taped together with the detail along the edge of each picture matched to the detail on the adjoining picture. This "editing" formed no basis for excluding the photographs from evidence.

It is a well-established rule in Nebraska that a traveler on a highway, when approaching a railroad crossing, has a duty to look and listen for the approach of trains. He must look, where by looking

he could see, and listen, where by listening he could hear, and if he fails without a reasonable excuse to exercise such precautions, then he is guilty of contributory negligence more than slight, as a matter of law, and no recovery can be had for damages resulting from a collision with a passing train. Milk House Cheese Corp. v. Chicago, B. & Q. R. R. Co., 161 Neb. 451, 73 N. W. 2d 679. See, also, Loudy v. Union P. R. R. Co., 146 Neb. 676, 21 N. W. 2d 431; McIntosh v. Union P. R. R. Co., 146 Neb. 844, 22 N. W. 2d 179; Mundt v. Chicago, R. I. & P. R. Co., 136 Neb. 478, 286 N. W. 691; Moreland v. Chicago & N. W. R. Co., 117 Neb. 456, 220 N. W. 692; Askey v. Chicago, B. & Q. R. Co., 101 Neb. 266, 162 N. W. 647; Chicago, B. & Q. R. Co. v. Schwanenfeldt, 75 Neb. 80, 105 N. W. 1101. The plaintiff argues that the rule was not applicable in this case because the plaintiff was entitled to expect that a flagman would be guarding the crossing if a train was in the vicinity; the other drivers did not stop, look, or listen at the crossing; and if he had looked he would not have been able to see the train.

The defendant had no independent duty to provide a flagman at the crossing. There is no obligation to install signal devices or maintain flagmen under all conditions even at arterial crossings. Sailors v. Lowden, 140 Neb. 206, 299 N. W. 510.

The evidence shows the contract between Western Contracting Corporation and the state placed the responsibility for obtaining flagmen upon Western. On request the railroad would furnish a flagman at the expense of Western. Requests were to be made to the depot agent who would then relay the request to the section foreman. There is no evidence that a flagman had been requested of the depot agent for July 15, 1974, although there was some evidence that the project superintendent for Western had told an unidentified railroad employee before the accident that, "we would be hauling there the next day and

every day from thereafter until the bridges were done and we were completed." The project superintendent also testified that a foreman working at the cement unloader told him that the foreman "had instructed the section foreman, I believe it was, that there was not a flagman there and that we were hauling."

The fact that there had been flagmen at the crossing on certain other days when the plaintiff had been working did not excuse the plaintiff from using ordinary care on the day of the accident. On the day the accident happened, the plaintiff had hauled 10 or 12 loads before the accident and knew or should have known there was no flagman at the crossing. The plaintiff had no right to assume that a flagman would be guarding the crossing when the collision occurred.

The failure of other drivers to use due care could not excuse the negligence of the plaintiff. All persons using a railroad crossing are required to exercise a degree of caution that is commensurate with the danger. Ecker v. Union P. R. R. Co., 164 Neb. 744, 83 N. W. 2d 551.

The plaintiff testified he would not have been able to see the train if he had looked, apparently because of the angle at which he approached the crossing. The evidence establishes conclusively that there was no obstruction to the view of a driver approaching the crossing for a distance of more than 400 feet south from the crossing and that the "haul road" crossed the railroad track at a 90-degree angle. The plaintiff's testimony that he could not have seen the train if he had looked "because of the angle" is contrary to the physical facts and did not create a jury question as to a reasonable excuse for failure to maintain a reasonable lookout.

The trial court instructed the jury that if it found for the defendant on its cross-petition the defendant was entitled to recover damages for the fair and rea-

sonable cost of making necessary repairs to its locomotives and the reasonable value of the loss of use of the locomotives while they were being repaired. The plaintiff contends the defendant's evidence was not sufficient to support the verdict for the defendant in the amount of $12,000.

The defendant established the cost of repairs by testimony from the assistant manager of its district accounting office. The information as to the cost of labor and materials used by the defendant in making the repairs was taken from the records of the company. The value of the loss of use of the damaged locomotives was determined by the rental charges for similar equipment when furnished by other railroads. This evidence established that the cost of repairs and loss of use exceeded $12,000 and was sufficient to establish the damages sustained by defendant as a result of the collision.

We have examined the other instructions which were assigned as error and find them to be not erroneous.

The judgment of the District Court is affirmed.

AFFIRMED.

BARTU, District Judge, concurring.

I concur with the result reached by the majority, but disagree with the comparative negligence principle enunciated.

For many years, in numerous railroad crossing comparative negligence cases cited by the majority opinion, and in other cases, which need no citation here, this court has upheld trial courts' directed verdicts and findings of contributory negligence in a degree greater than slight when compared with that of the adverse party, as a matter of law. These holdings have, in effect, granted jurisdiction to the trial courts to make that determination when, in fact, it has been expressly placed with the jury by the Legislature.

Section 25-1151, R. R. S. 1943, under which this

matter was tried, provided: "In all actions brought to recover damages for injuries to a person or to his property caused by the negligence of another, the fact that the plaintiff may have been guilty of contributory negligence shall not bar a recovery when the contributory negligence of the plaintiff was slight and the negligence of the defendant was gross in comparison, but the contributory negligence of the plaintiff shall be considered by the jury in the mitigation of damages in proportion to the amount of contributory negligence attributable to the plaintiff; and all questions of negligence and contributory negligence shall be for the jury."

The statute does not say "some questions of negligence and contributory negligence shall be for the jury," or "all questions of negligence and contributory negligence shall be for the jury, except in those cases where the court determines, as a matter of law, that contributory negligence is greater than slight when compared with that of the adverse party." It says, "all questions of negligence and contributory negligence shall be for the jury." "All" is defined as "the whole of; the whole number, quantity, or amount; every." Webster's New International Dictionary, Second Ed., Unabridged.

Obviously, in this case, the trial court found, and correctly so, that all parties were guilty of negligence in some degree in order to submit defendant's claim to the jury on a comparative negligence theory. It follows, inescapably, under the statute, that the plaintiffs' claim should also have been submitted. "All questions of negligence and contributory negligence shall be for the jury." The trial court was without jurisdiction to make the comparison negligence finding on plaintiff's claim against the defendant. No amount of interpretation or construction can change the plain meaning of the statute.

Reversal in this matter is avoided, however, not

because the trial court had jurisdiction to direct a verdict against the plaintiffs by finding, as a matter of law, that they were negligent in a degree greater than slight when compared with that of the defendant, but because the plaintiffs' negligence was, in effect, compared with that of the defendant upon the submission of defendant's claim to the jury on a comparative negligence theory.

Nevertheless, I feel compelled to disagree with the majority's enunciation and perpetuation of a principle that is contrary to law and, as such, results in a denial of substantive due process to litigants in a comparative negligence situation.

I, therefore, concur in the result only.