KERMIT L. WHITAKER AND AMERICAN COLLOID CARRIER
CORPORATION, APPELLANTS, V. BURLINGTON NORTHERN, INC.,
AND JOEL D. SCHAFFER, APPELLEES.

352 N.W.2d 589

Filed July 27, 1984.   No. 83-151.

Winner, Nichols, Douglas and Kelly, for appellants.

Holtorf, Kovarik, Nuttleman, Ellison, Mathis & Javoronok,
P.C., and William C. Beyers, for appellees.

BOSLAUGH, HASTINGS, and GRANT, JJ., and CHEUVRONT,
D.J., and COLWELL, D.J., Retired.

GRANT, J.

Plaintiff Kermit L. Whitaker was the owner of a truck trac-
tor and plaintiff American Colloid Carrier Corporation owned
a trailer and the cargo loaded on that trailer. On March 8, 1981,
Whitaker's tractor, being driven by Whitaker's employee, was
pulling the corporation's trailer and cargo. The tractor-trailer
rig was in collision with a train owned by defendant Burlington
Northern, Inc., and being operated by BN's employee, defend-
ant Joel D. Schaffer. Since the interests of the two named plain-
tiffs are treated by the parties as identical for the purposes of
this lawsuit, they will be referred to collectively as plaintiff.
Similarly, the two named defendants will be referred to as de-
fendant.

Plaintiff sued defendant for damages resulting from the col-

lision, alleging that defendant was negligent in not keeping a proper lookout; in not keeping its locomotive under proper control; in exceeding a safe speed; in failing to stop or attempting to stop the train; and in failing to slow down the train after the train operators saw plaintiff's rig stopped on the railroad tracks. In its answer defendant generally denied any negligence on its part, and alleged that plaintiff was contributorily negligent. At the conclusion of plaintiff's evidence at the jury trial of the issues, the trial court, on defendant's motion, directed a verdict in favor of defendant and dismissed the case. This appeal followed. Plaintiff assigns five errors, which may be consolidated into one, namely, that the court erred in granting defendant's motion for directed verdict because a jury question was presented either under general negligence theories or under the doctrine of last clear chance. For the reasons hereinafter set out we affirm.

In reviewing the case in the posture presented, we are bound by the rule, as set out in *Morris v. Laaker*, 213 Neb. 868, 331 N.W.2d 807 (1983), that the party against whom a verdict is directed is entitled to have every controverted fact resolved in favor of that party and to have the benefit of every inference that can reasonably be deduced from the evidence.

The record shows that the collision took place at the intersection of 21st Avenue and defendant's two main line railroad tracks east of Scottsbluff, Nebraska. Twenty-first Avenue is a two-lane road running north and south. The railroad tracks run slightly northwest to southeast and cross 21st Avenue at an angle of approximately 67°. The crossing was protected, as to traffic coming from the north, by a standard railroad crossbuck sign and a standard red, octagonal stop sign located a short distance north of the tracks. A paved highway known as the South Beltline Highway runs parallel to, and approximately 100 feet south of, the railroad tracks. The Beltline Highway intersects 21st Avenue at approximately the same angle of 67°. A standard red, octagonal stop sign to control southbound traffic on 21st Avenue at its intersection with the South Beltline Highway is located approximately 55 feet south of the southernmost tracks and approximately 45 feet north of the north edge of the Beltline Highway. At the northwest corner of 21st

Avenue and the Beltline Highway, construction work was going on and an excavation had been dug. The construction work was not on either highway, but was sufficiently close so as to make a right turn onto the Beltline Highway difficult for a rig such as plaintiff's. Barricades had been erected on 21st Avenue a substantial distance to the north of the tracks to give notice of the construction work.

From the crossing at 21st Avenue the tracks run east in a straight line, with unlimited visibility. To the west of the crossing the tracks run straight for approximately eight-tenths of a mile and then curve to the north.

Defendant's train consisted of 110 coal cars, 5 locomotives, and 1 caboose. The train was 5,982 feet long and weighed 14,467 tons. Plaintiff's rig was 59 feet in overall length, consisting of a tractor approximately 18 feet long pulling a trailer approximately 42 feet long. The trailer was loaded with 25 tons of cargo.

Plaintiff's driver, Larry Kuhlman, testified that he was proceeding south on 21st Avenue and stopped at the stop sign to the north of the tracks. At this stop he turned his tractor to the west at an angle in order to observe up the tracks as far as possible. This maneuver let Kuhlman see the eight-tenths of a mile west to the curve in the tracks, and the maneuver was necessary because of the angle at which the road and tracks intersected. Kuhlman saw there was no train approaching, and heard no train, and then continued south. The tractor and all but the last 10 feet of the trailer were across the track when Kuhlman noticed the excavation and construction at the northwest corner of 21st Avenue and the Beltline Highway. When Kuhlman noticed the excavation, he knew he "couldn't make that turn where my tractor was because I was right on the right-hand side of the road there." He stopped his rig at this point, which was approximately at the stop sign for the Beltline Highway, and some 45 feet north of the highway itself. Kuhlman then backed his rig up "approximately seven, eight feet, to twist my tractor around again so I could start my tractor to get on the left-hand side of the road so that the trailer would miss the hole . . . ." Kuhlman further testified that after backing up he again went forward and was struck by the train at the halfway point of the

42-foot trailer. Kuhlman estimated he was actually on the tracks "a couple minutes."

Kuhlman never saw the train, nor did he hear the whistle until a second before the collision. It was undisputed that the train's whistle was blowing the last one-quarter of a mile before the collision. With regard to seeing the train, or looking for a train before backing up, Kuhlman testified there were no back windows in the tractor, and with regard to rear vision, "Well, just the mirrors on the side of the truck but, you know, you just see straight back, that is all you can see." When later asked by plaintiff's attorney as to what visibility he had to his right, or west, Kuhlman stated, "Well, there isn't any, you just — All you can see is just a little bit behind you, you know, you couldn't see the railroad tracks where I was at all, from the truck where I was at."

According to plaintiff's expert witness, the train was going 31 miles per hour just west of the crossing. This witness also testified that at that speed it would take 1,630 feet for the train to stop if the emergency brakes were applied. The evidence is undisputed that the emergency brakes were applied and that the train came to rest 985 feet east of the point of collision. Plaintiff's expert also testified that this meant the emergency brakes were applied 644.6 feet west of the collision point, if the train was going 31 miles per hour. Defendant's conductor testified that as the train neared the "whistle post," which was one-quarter of a mile west of the crossing, the truck began to back up onto the tracks and the defendant's engineer applied the emergency brakes while blowing the train's whistle.

Monica Betancur was driving her automobile down the South Beltline Highway parallel to the train just before the collision. She estimated the train as proceeding at 30 to 35 miles per hour and saw plaintiff's rig "rocking back and forth" on the tracks. Her husband, Robert, testified that as they proceeded east on the highway and catching up on the train, he saw plaintiff's rig on the tracks, with the train about three-quarters of a mile away. He testified that the train's speed was between 30 and 35 and that when the train was one-half to one-quarter of a mile from the crossing, he believed there was going to be a collision. He also testified that the rig was always on the tracks "like this

rocking motion, like going back and forth on the tracks." After the collision this witness talked to the driver Kuhlman and testified that Kuhlman kept repeating, "I didn't see it" and "I didn't hear it." Kuhlman escaped any serious injury in the accident.

Plaintiff also adduced the testimony of Mitchell Endsley, the conductor on defendant's train. Endsley testified the speedometer in the engine indicated the train was going 30 miles per hour and that the rig was on the tracks about a minute and a half. Endsley then testified:

> Okay. I observed the truck. I can't really say if he stopped at the stop sign on the other side or not, but when I first saw him he was pulling over the tracks, pulled on over the tracks, stopped it there at the stop sign, and I would assume he stopped, stayed there a few seconds and, then, he backed up, started backing up on to the tracks. And the time he started back on the tracks that's when we put the train in emergency.

Endsley also testified that the defendant's engineer applied the train's emergency brakes approximately just east of the "whistle post," one quarter of a mile west of the crossing.

As can be seen from an examination of the facts just set out, it is clear that the legal question presented is nothing more than an exaggerated form of the usual grade crossing accident involving a vehicle approaching a crossing and failing to stop for an oncoming train in plain view.

As stated in *Wyatt v. Burlington Northern, Inc.*, 209 Neb. 212, 215-17, 306 N.W.2d 902, 905-06 (1981):

> The rules which are applicable to motorists approaching railroad grade crossings in this state are well settled. In *Thomas v. Burlington Northern R.R., Inc.*, 203 Neb. 507, 510-11, 279 N.W.2d 369, 372 (1979), we said: "It is a well-established rule in Nebraska that a traveler on a highway, when approaching a railroad crossing, has a duty to look and listen for the approach of trains. He must look, where by looking he could see, and listen, where by listening he could hear, and if he fails without a reasonable excuse to exercise such precautions, then he is guilty of contributory negligence more than slight, as a matter of law, and no recovery can be had for damages resulting from a collision

with a passing train . . . .

. . . .

The ordinary rules of the road which are applicable to motor vehicles crossing at highway intersections have no application to railroad trains approaching grade crossings. Although railroad trains may not have an absolute right-of-way at grade crossings under all conditions, there is no duty on the part of the engineer operating the train to yield the right-of-way until the situation is such as to indicate to a reasonably prudent person that to proceed would probably result in a collision. At that time it becomes the duty of the engineer to exercise ordinary care to avoid an accident, even to the extent of yielding the right-of-way. *Carter v. Chicago, B. & Q.R.R. Co.*, 175 Neb. 188, 121 N.W.2d 44 (1963). The defendants in this case complied fully with these rules and did everything possible in an effort to stop the train when it became reasonably apparent that Wyatt might not stop before reaching the crossing.

In the case at bar plaintiff's driver had complied with his duties as a driver approaching a grade crossing and had safely negotiated the crossing, except for the last 10 feet of his trailer, when he stopped his rig and began to back up, thus recrossing the tracks from the other direction, without being able to see at all in the direction from which the train was approaching. As to this recrossing, it is undisputed that plaintiff's driver did not look at all. It is established that this maneuvering was done in an area where plaintiff's driver had approximately 100 feet to turn his 59-foot rig between the tracks and the Beltline Highway, although admittedly that 100 feet included some 45 feet past the stop sign. To recross the tracks in that position and not looking in the only direction of possible danger constitutes contributory negligence more than slight as a matter of law, which negligence is sufficient to deny recovery to plaintiff.

With regard to plaintiff's contention that the case should have been submitted to the jury under the theory of last clear chance, we determine that the trial court was correct in holding that the doctrine of last clear chance did not apply to the facts presented in this case. It is established in our case law, and

stated in the last clear chance instruction, NJI 3.23, that one of the propositions which plaintiff must prove in order to be entitled to that doctrine of the law is "that the active negligence of the plaintiff had ceased and was not a contributing factor to the accident." Both parties cite *Maricle v. Spiegel*, 213 Neb. 223, 329 N.W.2d 80 (1983), in this connection. While the holding of that case is premised on the determination that the last clear chance doctrine is not available to a defendant, the case, in generally discussing the subject, does refer to the fact that "[f]urthermore, the doctrine of last clear chance is factually inapplicable, as the negligence of the party seeking to invoke it was active and continuing as a contributing factor up to the time of injury." *Id.* at 227, 329 N.W.2d at 84.

In this case plaintiff's negligence continued up to the instant of the collision in that his driver did not look for danger and did not hear the warning whistle, which admittedly was blowing, until a second before the collision. Even a late awareness of the obvious danger approaching might have enabled plaintiff's driver to escape. As stated in *Bush v. James*, 152 Neb. 189, 196, 40 N.W.2d 667, 672 (1950), " 'A person who is himself negligent may not recover under the doctrine of the last clear chance where his negligence is active and continuing to the very time of the accident. Such a situation involves questions of comparative negligence and not those of the last clear chance doctrine.' "

The action of the trial court in dismissing plaintiff's case at the conclusion of plaintiff's evidence was correct and is affirmed.

AFFIRMED.