ARTHUR J. AND DIANE K. ANDERSON, APPELLEES, V. UNION
PACIFIC RAILROAD COMPANY, A CORPORATION, APPELLANT.
426 N.W.2d 518

Filed July 29, 1988. No. 86-904.

322

Kay & Kay for appellant.

Graten D. Beavers and Dirk V. Block, of Knapp, Mues, Beavers & Luther, for appellees.

BOSLAUGH, WHITE, and SHANAHAN, JJ., and THOMPSON and SPRAGUE, D. JJ.

SHANAHAN, J.

Union Pacific Railroad Company appeals from a judgment on the verdict for Arthur J. and Diane K. Anderson as the result of a truck-train collision at a public crossing. Andersons alleged that Union Pacific negligently created and maintained a "dangerous and hazardous" railroad crossing, which proximately caused damage to Andersons' semi when a Union Pacific freight train collided with the tractor and trailer. Union Pacific raised the affirmative defense of contributory negligence by the semi's driver, who was Andersons' employee.

In all but one of the errors assigned, Union Pacific claims that, as a matter of law, Andersons' driver was contributorily negligent in a degree which barred recovery and which necessitated a summary judgment, directed verdict at conclusion of all the evidence, judgment notwithstanding the verdict, or new trial. In its final assignment of error, Union Pacific contends that the jury should have been instructed on the truckdriver's failure to maintain reasonable control over the semi, an element of the alleged contributory negligence. We affirm.

APPELLATE REVIEW; NEGLIGENCE CASES

"A party against whom a motion to dismiss is directed is entitled to have all such party's relevant evidence accepted or treated as true, every controverted fact as favorably resolved, and every beneficial inference reasonably deducible from the evidence." *Rahmig v. Mosley Machinery Co.*, 226 Neb. 423, 449, 412 N.W.2d 56, 73-74 (1987).

A court cannot decide an issue as a matter of law unless the facts adduced on an issue are such that reasonable minds can draw but one conclusion from the evidence. *Rahmig v. Mosley Machinery Co., supra.* In a jury trial, when evidence compels but one reasonable conclusion regarding an issue or question in the litigation, a court can properly direct a verdict on such issue or question. *Edwin Bender & Sons v. Ericson Livestock Comm. Co.*, 228 Neb. 157, 421 N.W.2d 766 (1988). See, also, *Rahmig v. Mosley Machinery Co., supra.*

> [I]n a jury trial of a negligence action, the trial court must decide whether a plaintiff is guilty of negligence, and, if so, must then decide whether evidence is such that only one reasonable conclusion is permissible—the plaintiff's contributory negligence which, as a matter of law, bars recovery and authorizes a directed verdict for the defendant. [Citations omitted.] If, as the result of such initial consideration of the evidence, the trial court determines that the jurors may reasonably draw different conclusions from the evidence, existence of the plaintiff's negligence or contributory negligence and comparative negligence are questions of fact for the jury.

*Rahmig v. Mosley Machinery Co., supra* at 451, 412 N.W.2d at 75.

> To determine whether conduct constitutes negligence, the invariable standard is reasonable care, although reasonable care is directly proportional to the danger inherent in conduct and may vary depending on the circumstances. . . .
>
> . . . .
>
> One who is capable of understanding and discretion but fails to exercise ordinary care and prudence to avoid obvious dangers is negligent or contributorily negligent.

*Lynn v. Metropolitan Utilities Dist.*, 225 Neb. 121, 126-27, 403 N.W.2d 335, 339 (1987). See, also, *Prime Inc. v. Younglove Constr. Co.*, 227 Neb. 423, 418 N.W.2d 539 (1988); *Rahmig v. Mosley Machinery Co., supra.*

CONDITIONS AT THE CROSSING

Surrounded by industrial facilities which generate high levels of noise, Union Pacific's crossing near Darr, Nebraska,

involves a two-lane gravel county road, which runs north and south over three sets of east-west tracks. The length of the crossing is approximately 45 feet. A main line track runs parallel with and on each side of a center siding track. In traversing the crossing, a northbound motorist crosses the eastbound main line, the center siding track, which usually contained empty railroad cars, and, finally, the westbound main line. The main lines are 14 feet from the center siding track. Standard crossbuck signs at the south and north edges of the railroad right-of-way inform approaching motorists that there are three sets of tracks crossing the public road. Beneath the crossbuck are alternating red lights, flashers which are supposed to automatically warn motorists about railroad traffic. The flasher-signals, however, for some time had been falsely indicating the presence of an approaching train, when actually no train was approaching. Beginning in the late 1970s, the signal's alternating lights would flash continuously for hours at a time, notwithstanding the absence of any train or railroad car on the tracks. Some of the local folks had notified Union Pacific about the malfunctioning crossing flashers, but the railroad claimed it had no knowledge of the signals' false indication and, therefore, never rectified the deceptive signals. Although employees at a nearby alfalfa mill verified that the signals were malfunctioning with false indications 2 weeks before the accident, Union Pacific steadfastly maintained that the crossing flashers were properly working 4 months before the collision. Several witnesses testified that they would ignore the flashing warning lights at the crossing, taking for granted that the warnings were false, and looked for trains no matter what the signals were indicating.

On the center siding at a point 218 feet east of the crossing, Union Pacific parked a string of 17 empty hopper cars, each with an approximate length of 55 feet, for a combined distance of around 935 feet from the first hopper to the last at the east end of the string of cars. Although Union Pacific had been repeatedly requested to take away the empty cars, the railroad did not remove the hoppers before the accident. West of the crossing, Union Pacific had also placed a number of hopper cars on the center siding.

Ken Zimmerman, manager of the alfalfa mill near the crossing, testified that one could not see a train on the westbound Union Pacific main line when hopper cars were on the center siding, obstructing a northbound motorist's view to the east of the crossing. According to Zimmerman, railroad traffic on the westbound main line would "blend in" with the stationary railroad cars on the center siding. An engine's whistle could be faintly heard while a westbound train was behind the railroad cars on the siding. As characterized by Zimmerman, on account of the obstructed view from the railroad cars standing on the siding, the only way a motorist "could pass safely" would require a motorist to stop on the crossing, get out of the vehicle, and go to a point where the motorist could look down the westbound main line to assure there was no approaching traffic. Union Pacific acknowledged that empty railroad cars were not supposed to be parked on a siding too close to a grade crossing.

## THE COLLISION

Weather conditions were not a factor in the accident which occurred on February 9, 1984. Ronald R. McCully, Andersons' employee, was driving the Andersons' semi north on the road toward the crossing and did not recall whether the flasher-signal was operating at the time. Having used this particular crossing in his route during the past, McCully had previously observed that the warning signals continually flashed even when no train was approaching the crossing. McCully did not know which tracks were main line or siding. Somewhere around 6 feet south of the flasher for northbound vehicles, McCully "looked to the right or east to see if there was any trains coming . . . started across the tracks and looked across to make sure there was no trains coming." Without stopping, McCully passed the south flasher and again looked for approaching railroad traffic, but saw only the hopper cars on the center siding east of the crossing. At 7 miles per hour, the semi moved onto the tracks. As the semi was crossing the eastbound main line, McCully noticed an approaching southbound truck at the north edge of the crossing. Having determined that no railroad traffic was in the area, McCully began watching the approaching southbound truck. After the Anderson semi had crossed the

eastbound main line, McCully "heard the whistle," and "At that time I knew there was a train coming. I stepped on the accelerator, looked in my right rear-view mirror and seen the train hit the trailer." In McCully's words, it was only "a second or two" between the time he heard the engine's whistle and the impact of the collision. As McCully explained, after he had looked for the second time while traversing the crossing, McCully no longer looked for trains because "I figured the tracks were clear and that alfalfa truck was coming. I was concerned what he [the driver of the approaching truck] was going to do."

The westbound Union Pacific freight consisted of 126 cars and 6 diesel locomotive units. The first unit, where the engineer was located, had a yellow flashing light rotating atop the cab and had its dual headlights operating at the time of the accident. Therefore, at the time of the collision, the engine's lights were on, its bell was ringing, and its whistle was sounding. The engineer first noticed the truck on the crossing when the engine had cleared the westernmost hopper on the center siding. Union Pacific admitted that the engineer first noticed the truck when the train was 50 to 100 feet from the crossing. The head brakeman, located in the engine's cab, saw the truck when the train was 100 to 200 feet from the crossing. Union Pacific claimed that its train was moving at 40 to 50 miles per hour, but no tachogram substantiates that speed, because Union Pacific was "unable to locate [the] speed tape." As soon as he saw the semi, the engineer grabbed the brake valve and "went into emergency," but was unable to avoid the collision which occurred "almost immediately" after the engineer first observed the semi. As a result of the impact, the Anderson rig was shoved approximately 600 feet westward, destroying the semi. An employee of the alfalfa mill testified that he was driving his westbound vehicle on U.S. Highway 30, parallel with the Union Pacific main line, and noticed that the freight train was traveling 65 miles per hour as it approached the crossing.

## ANDERSONS' EXPERT WITNESS

Andersons' expert witness, Dr. William Berg, a professor of civil and environmental engineering, examined and evaluated

the grade crossing where the collision occurred. Much of Dr. Berg's testimony related to the interwoven issues of the railroad's negligence and the contributory negligence of McCully. Dr. Berg concluded that the crossing was dangerous because Union Pacific failed to satisfy minimum safety standards in constructing and maintaining the crossing. Automatic crossing gates should have been installed, on account of the multiple main line, a motorist's obstruction of view resulting from stationary railroad cars on the center siding, and high-speed train operation, combined with the multiple tracks at the crossing and the obstructed view for northbound motorists. The setting at the crossing resulted in the likelihood of a "hidden train" moving behind the stationary hoppers on the center siding. Automatic crossing gates would have kept vehicular traffic off the crossing until an approaching train had passed over the crossing.

The false warnings from the malfunctioning signal-flashers caused a "credibility problem" for motorists. Knowing that the flashers had continually malfunctioned by giving false indications of train traffic, motorists would disregard the signals and proceed to a point on the crossing where they might visually verify the presence of approaching railroad traffic. The situation is dangerously compounded by the presence of standing railroad cars on the center siding. A driver must continue to move forward on the crossing to see around the stationary railroad cars before there is visual verification of an approaching train behind the hoppers on the siding. At the point of such verification, there will be inadequate time for the motorist's vehicle to clear the track on which the train is approaching.

Given the semi's speed of $7^1/2$ miles per hour, the train's speed of 46 miles per hour, and the driver's reaction time of $2^1/2$ seconds to stop the Anderson semi, Dr. Berg calculated that there was "no time available" for McCully to stop the semi in advance of the westbound main line, after McCully passed the center siding and could have seen the approaching westbound train: "The last point that you would have been able to apply the brakes and stop was also the very first point in which that train could have been viewed if you were looking directly at it."

While only the head end of an approaching westbound freight was hidden by the hoppers on the center siding, the remainder of the train, although visible beyond the furthest hopper on the east, would have been indiscernible as a separate and moving train, or, as explained by Dr. Berg:

> [B]ecause at that distance [between Andersons' semi and the furthest hopper] everything blends together. In other words, in perspective, this train, the farther it is away, gets smaller and smaller and smaller. And if you were to see another approaching train or if there in fact was another approaching train, it would be very difficult to determine whether it was simply a part of this train that's on a center track or whether it is another train approaching. So, no, it would be unreasonable to expect a motorist to be able to make that judgment reliably.

In summary, Dr. Berg testified that the principal causal factors of the accident were (1) lack of a credible warning device and (2) sight obstruction caused by the stationary hoppers on the center siding. Under the circumstances, Dr. Berg concluded that McCully's conduct in operating the semi was not the cause of the accident inasmuch as the obstruction on the center siding prevented a motorist's perception of the threat from an approaching train on the westbound main line.

At the conclusion of all evidence, Union Pacific requested a directed verdict against Andersons, which the district court denied. The transcript does not contain Union Pacific's requested instructions. However, at the conference on instructions, Union Pacific requested that the jury be instructed "on the failure of the plaintiffs' driver to maintain a semi-tractor trailer under reasonable control," to which the district court responded: "I don't find any evidence of that, so I won't use it." After the verdict for Andersons, Union Pacific requested judgment notwithstanding the verdict or a new trial, both of which were denied by the court. As previously indicated concerning the assignments of error, Union Pacific does not question the jury's finding that the railroad was negligent; rather, Union Pacific questions only the effect of McCully's conduct as contributory negligence and the court's refusal to give an instruction concerning lack of reasonable control in the

operation of Andersons' semi.

## CROSSING A CROSSING

Neb. Rev. Stat. § 39-655(1) (Reissue 1984) provides in pertinent part:

Whenever any person driving a vehicle approaches a railroad grade crossing under any of the circumstances set forth in this section, the driver of such vehicle shall stop within fifty feet but not less than fifteen feet from the nearest rail of such railroad and shall not proceed until he can do so safely. The requirements of this subsection shall apply when:

(a) A clearly visible electric or mechanical signal device gives warning of the immediate approach of a railroad train;

. . . .

(c) A railroad train approaching within approximately one quarter mile of the highway crossing emits a signal audible from such distance and such railroad train, by reason of its speed or nearness to such crossing, is an immediate hazard; or

(d) An approaching railroad train is plainly visible and is in hazardous proximity to such crossing.

Regarding the rules generally applicable to motorists approaching a railroad grade crossing, this court has consistently stated:

" 'It is a well-established rule in Nebraska that a traveler on a highway, when approaching a railroad crossing, has a duty to look and listen for the approach of trains. He must look, where by looking he could see, and listen, where by listening he could hear, and if he fails without a reasonable excuse to exercise such precautions, then he is guilty of contributory negligence more than slight, as a matter of law, and no recovery can be had for damages resulting from a collision with a passing train. . . .' "

*Whitaker v. Burlington Northern, Inc.*, 218 Neb. 90, 94-95, 352 N.W.2d 589, 593 (1984). See, also, *Wyatt v. Burlington Northern, Inc.*, 209 Neb. 212, 306 N.W.2d 902 (1981); *Hegarty v. Campbell Soup Co.*, 214 Neb. 716, 335 N.W.2d 758 (1983); *Thomas v. Burlington Northern R.R., Inc.*, 203 Neb. 507, 279

N.W.2d 369 (1979); *Starlin v. Burlington Northern, Inc.*, 193 Neb. 619, 228 N.W.2d 597 (1975).

When a motorist approaches a railroad crossing, with which the motorist is acquainted or conversant but for which the motorist's view is restricted or obstructed, the motorist has the duty to look and listen at a time and place where looking and listening will be effective to prevent an accident, and failure to observe this rule, without reasonable excuse for noncompliance, may be negligence. See, *Neusbaum v. Chicago & N. W. Ry. Co.*, 162 Neb. 754, 77 N.W.2d 299 (1956); *McQuin v. Missouri P. R. Corporation*, 122 Neb. 423, 240 N.W. 515 (1932).

In *Bertrand v. Missouri Pacific Railroad Company*, 160 So. 2d 19, 21-22 (La. App. 1964), the court characterized the "dangerous trap doctrine" applicable to railroad grade crossings:

> "[I]f a crossing is unusually dangerous because the view of the motorist is so obstructed as to require that he place himself in a position of peril dangerously near the tracks, before he has a view of the oncoming train, the railroad company will be held liable, unless it can show that it took unusual precautions, such as reducing the speed of the train, or increasing its warnings and providing signaling devices, etc. The theory of this doctrine is that the railroad may not rely upon the duty of the motorist to stop and look, if the physical circumstances are such that stopping and looking will do the motorist no good."

At a railroad crossing obstructed to an approaching motorist's view, the approaching motorist has no absolute duty to stop before traveling on the crossing, but such duty to stop exists where a reasonably prudent person in the exercise of ordinary care would have considered a stop necessary under the circumstances. See *Pennington v. Southern Pac. Co.*, 146 Cal. App. 2d 605, 304 P.2d 22 (1956). A rule similar to the immediately preceding was applied in *Crabtree v. Missouri P. R. Co.*, 86 Neb. 33, 124 N.W. 932 (1910), a wrongful death action for a decedent who was run over and killed by Missouri Pacific's steam engine moving on a track obstructed by freight cars near the crossing on which the plaintiff's decedent, a

9-year-old girl, was walking. Background noise "drowned the noise" from defendant's engine, including the sound of the ringing bell and blowing whistle, and other traffic in the vicinity distracted the little girl on the crossing. 86 Neb. at 39, 124 N.W. at 934. A plaintiff's verdict was upheld against the railroad's appeal, and this court stated:

> The rule in this state is not that there is an absolute obligation upon a person crossing a railway track to stop, look and listen before attempting to cross, but, as laid down in *Omaha & R. V. R. Co. v. Talbot*, 48 Neb. 627, the duty of the traveler upon a public highway approaching a railroad crossing is to exercise ordinary care. If he goes "upon a railroad crossing without first listening and looking for the approach of a train, *without a reasonable excuse therefor* . . . and if such failure to look and listen contributes to the party's injury, he cannot recover." The qualifying words, "*without a reasonable excuse therefor*", are of great significance in this connection. If, as in this case, the view of approaching trains is obstructed by freight cars standing near the crossing, if the traveler's attention is distracted by moving trains upon other tracks, or by other sounds or sights, if no warning signals are given or lookouts stationed, it is a question for the jury as to whether or not the traveler exercised ordinary care.

86 Neb. at 44, 124 N.W. at 936.

We do appreciate the predicament of the crew, who were charged with the responsibility of moving a mile-long freight train with dispatch and who were confronted with the stationary screen of railroad cars near the crossing, a trap set not by the train crew but by their employer. By the same token, we appreciate the problem facing a northbound motorist using the crossing, who might have to consider stopping in advance of the westbound main line, leave his vehicle on the crossing and perhaps blocking the eastbound main line, move to a point where the motorist could peer around the screen of cars parked on the center siding, and, on ascertaining there was no approaching westbound railroad traffic, return to his vehicle to continue the trek across the tracks, if his vehicle had not been hit by an eastbound train. Under the circumstances, the only

absolute rule to prevent a train-vehicle accident on the crossing in question would be: When a train and a vehicle simultaneously approach an obstructed crossing, both shall come to a complete stop, and neither shall depart until the other has gone. That rule, however, is somewhat impractical.

Union Pacific chides McCully's conduct, states that McCully violated § 39-655(1), asserts that "unreliability of the crossing signals and presence of railroad cars on the center siding track required Mr. McCully to exercise greater care" (brief for appellant at 25), and concludes that, as a matter of law, McCully was contributorily negligent, barring Andersons' recovery, because McCully

> was aware of the presence of the cars on the center siding track east of the crossing as he approached the crossing. Mr. McCully testified that while he was proceeding across the crossing his attention was focused on a truck approaching the crossing from the south [sic]. Neither the approaching truck nor the cars on the center siding track excused Mr. McCully from his duty to look, listen and stop for an approaching train.

Brief for appellant at 33.

As in the case of any other statute, applicability of § 39-655(1) depends on the particular factual setting. McCully did look twice to assure himself that no train was approaching and concurrently saw the southbound truck as it prepared to use the crossing. The parked railroad cars on the center siding may have caused a twofold effect in production of the accident. First, the stationary cars caused an optical distortion of approaching westbound trains. Second, the cars on the siding muted the sound of the engine's ringing bell and blowing whistle as well as prevented a northbound motorist's seeing the engine's lights. Acuity of a northbound motorist's hearing may have been dulled by the industrial din at the crossing. Of no small import is the continually malfunctioning flasher-signal with its false warning, a lighted Lorelei luring motorists onto the crossing where they had to make a necessarily belated determination whether train traffic was approaching. To obtain the continuous panoramic view of the crossing, as Union Pacific would require, a motorist must look to the east for an

approaching westbound train, then ahead for oncoming vehicular traffic at or on the crossing, and, finally, to the west for an eastbound train. Upon completion of that sequence, the motorist would have to immediately reverse the cycle or repeat the sequence, all within a millisecond or less for oscillation of the motorist's head, to assure observation of any possible or probable danger in every sector of the crossing. The more realistic approach to a situation such as that in the present case is the rule applied in *Crabtree v. Missouri P. R. Co.*, 86 Neb. 33, 124 N.W. 932 (1910), namely, if there is a reasonable excuse for not seeing the approaching train, such as an obstruction preventing one from seeing the train or a distraction diverting the attention, the question whether conduct in traversing a railroad crossing is reasonable is a matter for the jury. In view of the variables and conditions inherent in the setting for the crossing accident in this case, we cannot conclude that McCully's conduct was unreasonable and, as a matter of law, was contributory negligence as a bar to Andersons' recovery. Under the circumstances, whether McCully's conduct was reasonable, that is, whether he exercised ordinary care and prudence in operating Andersons' semi, was a jury question. Since McCully's conduct presented a jury question, Union Pacific's claims of error regarding the district court's denying a summary judgment, directed verdict, judgment notwithstanding the verdict, and new trial are without merit.

## REJECTED INSTRUCTION

Although Union Pacific's requested instruction does not physically appear in the record, nevertheless, we treat Union Pacific's assignment of error as tantamount to a claim that the district court should have given an instruction on McCully's alleged lack of reasonable control in operating the Andersons' semi. Notwithstanding absence of a request for a specific instruction, a trial court must instruct a jury on material or relevant issues presented by the pleadings and supported by the evidence. *Maloney v. Kaminski*, 220 Neb. 55, 368 N.W.2d 447 (1985); *McCauley v. Briggs*, 218 Neb. 403, 355 N.W.2d 508 (1984); *Juniata Feedyards v. Nuss*, 216 Neb. 29, 342 N.W.2d 1 (1983). As the district court quite correctly noted, there is no evidence that McCully failed to control the semi; hence, the

court properly refused to instruct on lack of control.

AFFIRMED.