JOHN MONAGHAN, APPELLEE, V. UNION PACIFIC RAILROAD COMPANY, A CORPORATION, APPELLANT.

496 N. W. 2d 895

Filed March 12, 1993.    No. S-90-351.

William J. Lamson, Jr., and Mark E. Novotny, of Kennedy, Holland, DeLacy & Svoboda, for appellant.

J. Thomas Rowen and John T. Carpenter, of Carpenter, Rowen & Fitzgerald, P.C., for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

SHANAHAN, J.

In an action brought under the Federal Employers' Liability Act (FELA), 45 U.S.C. § 51 et seq. (1988), Union Pacific Railroad Company (UP) appeals from the judgment on a verdict for John Monaghan on his claim for a loss of hearing as the result of employment at UP's shops. UP contends that the district court for Douglas County should have directed a verdict for UP because Monaghan's claim was barred by the act: "No action shall be maintained under this chapter unless commenced within three years from the day the cause of action accrued." 45 U.S.C. § 56 (1988).

## STANDARD OF REVIEW

A party against whom a motion to dismiss is directed is

entitled to have all relevant evidence accepted or treated as true, every controverted fact as favorably resolved, and every beneficial inference reasonably deducible from the evidence. . . .

"A court cannot decide an issue as a matter of law unless the facts adduced on an issue are such that reasonable minds can draw but one conclusion from the evidence. . . . In a jury trial, when evidence compels but one reasonable conclusion regarding an issue or question in the litigation, a court can properly direct a verdict on such issue or question."

*Burns v. Veterans of Foreign Wars*, 231 Neb. 844, 850, 438 N.W.2d 485, 489-90 (1989) (quoting *Anderson v. Union Pacific RR. Co.*, 229 Neb. 321, 426 N.W.2d 518 (1988)). Accord, *Eccleston v. Chait*, 241 Neb. 961, 492 N.W.2d 860 (1992); *Dale v. Thomas Funeral Home*, 237 Neb. 528, 466 N.W.2d 805 (1991); *Rahmig v. Mosley Machinery Co.*, 226 Neb. 423, 412 N.W.2d 56 (1987).

## MONAGHAN'S WORKPLACE

Monaghan began working as a machinist for UP in 1958 at the railroad's Omaha shops where diesel locomotives were repaired or rebuilt. Noise was so loud throughout the shop that "you didn't talk to a person, you kind of yelled at him." In an attempt to communicate with one another, shop employees had to "holler at each other."

Around 1978, Monaghan's work involved daily "load testing" a collection of four to eight diesel locomotives simultaneously parked on four adjacent tracks near the shop. Load testing, the noisiest operation at the shop, was designed to assure that rebuilt or repaired generators, compressors, and engines functioned properly before a locomotive returned to service. For load testing, which might last from 4 to 8 hours each day, a locomotive's throttle was increased a "notch" at a time until an engine's maximum revolutions were reached at the eighth notch on a throttle, resulting in noise much like a "jet engine." On occasion, the noise generated by load testing became so intense that it "blew windows out of the shop." In the testing area, employees communicated "strictly by hand signal

or head nodding." Even inside a locomotive being tested, employees next to each other had to "yell" in an attempt to communicate. Employees made an effort to protect themselves and block the noise by inserting toilet paper or rags into their ears since UP did not provide any protection from noise at the shop. In 1985, however, UP began supplying earplugs and, starting in 1987, required that shop employees wear earplugs in the shop.

## MONAGHAN'S HEARING PROBLEMS

Sometime in 1980, Monaghan noticed a "ringing" in his ears. In 1984, during an examination by Dr. William Carter, an otolaryngologist, Monaghan's "ringing" condition was diagnosed as tinnitus which Dr. Carter described as an "abnormal noise" perception or "a false noise" because

> [t]here really is no noise there, but the patient feels that they hear this and it can take any form. It can be like crickets; it can be like bells ringing; it can be like winds howling; it can be like motors running; and it can vary in its intensity from very, very mild to very, very severe.

Tinnitus is the "head noises than an individual experiences sometimes without a hearing impairment."

Monaghan first realized that he had suffered a loss of hearing in 1987, when he was again examined by Dr. Carter.

## MONAGHAN'S SUIT AND TRIAL

Monaghan filed his FELA action on June 14, 1988, and alleged that UP was negligent by failing to provide protective equipment to prevent Monaghan's loss of hearing and otherwise provide a safe workplace.

Monaghan testified that, before the examination by Dr. Carter in 1987, Monaghan "didn't know if [the noise at UP's shop] was harmful" to his hearing, did not know that the noise was "damaging" his hearing, and did not know that he was "losing" his hearing or had sustained a "hearing loss," although he did, as a result of "noise at work," experience tinnitus or "ringing" in his ears.

During Monaghan's trial, experts, including Dr. Carter, testified that Monaghan's noise-induced permanent loss of hearing was caused by exposure to excessively loud and

prolonged noise over a long period of time.

Dr. David Lipscomb, an audiologist, testified in detail concerning the structure and function of the human ear and described how intense noise causes physical damage to the ear, resulting in a loss of hearing. When the cochlea, a small tube in the inner ear, is exposed to prolonged or repeated loud noise, cochlear cells "die." There is no mechanism to replace destroyed cochlear cells necessary to activate nerves for transmitting data to the brain; hence, a noise-induced loss of hearing is permanent. An audiometric examination of Monaghan in 1988 showed that he had suffered a noise-induced loss of hearing. As Dr. Lipscomb testified: "Unless there is a sudden accidental exposure to sound, such as an explosion, the development of a noise induced hearing impairment occurs slowly, over time, seldom recognized by the individual . . . ."

Dr. Carter distinguished a noise-induced hearing loss from an "acoustic trauma." A noise-induced hearing loss is "caused by frequent or constant exposure to very loud noise over prolonged periods of time," whereas an acoustic trauma is a hearing loss that is caused by "one exposure to excessively loud noise." Also, Dr. Carter explained that "tinnitus is purely a subjective complaint and what I mean by that is that only the patient himself knows if he has tinnitus. I can't tell you if he does; you can't tell if he does; nobody can tell." Tinnitus is distinguished from a loss of hearing that can be objectively determined by testing with scientifically accepted equipment and methods, such as the audiogram which showed that Monaghan had actually suffered a loss of hearing. Dr. Carter concluded that Monaghan's loss of hearing was "a gradually-acquired loss over a 28-year span of time and due to frequent exposure to excessively loud noise," that is, Monaghan's "ear has been damaged by exposure to excessively loud noise during his 28 years of employment with the railroad."

At the conclusion of all the evidence, UP moved for a directed verdict because Monaghan's "cause of action is barred by the applicable statute of limitations in that [Monaghan] knew or should have known his cause of action accrued more than 3 years before June 14, 1988, the date on which

[Monaghan] filed his petition." The court overruled UP's motion and instructed the jury that the statute of limitations under the Federal Employers' Liability Act did not bar Monaghan's claim unless Monaghan, on or before June 13, 1985, knew that he had a loss of hearing or, in the exercise of reasonable care, should have known that he had a loss of hearing. The jury returned a verdict for Monaghan.

UP's assignments of error may be distilled into one: The 3-year statute of limitations under the Federal Employers' Liability Act barred Monaghan's action; therefore, the district court should have directed a verdict for UP.

## FEDERAL EMPLOYERS' LIABILITY ACT
*Preemption by Federal Law.*

> The Federal Employers' Liability Act preempts state law and statutorily supplies uniform law controlling a railroad employee's claim for damages caused by negligence of the employer railroad while the employee is engaged in the railroad's interstate commerce activity. . . .
>
> . . . .
>
> Courts of the United States and courts of the several states have concurrent jurisdiction over claims controlled by the Federal Employers' Liability Act. 45 U.S.C. § 56. In disposing of a claim controlled by the Federal Employees' Liability Act, a state court may use procedural rules applicable to civil actions in the state court unless otherwise directed by the act, [citations omitted.], but substantive issues concerning a claim under the Federal Employers' Liability Act are determined by the provisions of the act and interpretative decisions of the federal courts construing the Federal Employers' Liability Act . . . .

*Chapman v. Union Pacific Railroad*, 237 Neb. 617, 621-23, 467 N.W.2d 388, 392-93 (1991).

*Burden of Proof Re: Statute of Limitations.*

> Compliance with 45 U.S.C. § 56 is a condition precedent to an injured employee's recovery in a FELA action. . . . Failure to timely bring suit not only bars the claimant's remedy, but it also destroys the employer's

liability. . . . "For if a statute of limitations is thus made a limitation upon the continued existence of the right, rather than a mere bar to suit upon it, it goes to the substance of the plaintiff's claim so that he must show himself to be within the statute in order to recover . . . ." The burden is therefore on the claimant to allege and to prove that his cause of action was commenced within the three-year period.

*Emmons v. Southern Pacific Transp. Co.*, 701 F.2d 1112, 1117-18 (5th Cir. 1983) (quoting *Goodwin v. Townsend*, 197 F.2d 970 (3rd Cir. 1952)). Consequently, in an action under the Federal Employers' Liability Act, a plaintiff must prove that the action was commenced within the 3-year period specified by § 56 of the act. Hence, Monaghan had the burden to prove that he timely filed his FELA action against UP.

*The FELA Statute of Limitations.*

Although the Federal Employers' Liability Act does not contain a definition or characterization of "occupational disease," from a medical standpoint, an occupational disease is "any deviation from or interruption of the normal structure or function" of the human body and which is "due to factors involved in one's employment." Dorland's Illustrated Medical Dictionary at 481, 490 (27th ed. 1988). According to Professor Arthur Larson, an occupational disease is "any disease arising out of exposure to harmful conditions of the employment, when those conditions are present in a peculiar or increased degree by comparison with employment generally." 1B A. Larson, The Law of Workmen's Compensation § 41.00 (1992). The preceding characterization by Larson has been adopted by federal courts to define "occupational disease" in the absence of a definition expressed in federal statutes. See, *Liberty Mut. Ins. Co. v. Commercial Union Ins. Co.*, 978 F.2d 750 (1st Cir. 1992) (Longshore and Harbor Workers' Compensation Act); *Gencarelle v. General Dynamics Corp.*, 892 F.2d 173 (2nd Cir. 1989). Therefore, for the purpose of the Federal Employers' Liability Act, an occupational disease is a condition which causes impairment, deviation, or interruption of the normal structure or function of a worker's body and which results from

hazards or conditions peculiar to a particular occupation or employment.

In *Urie v. Thompson*, 337 U.S. 163, 69 S. Ct. 1018, 93 L. Ed. 1282 (1949), the U.S. Supreme Court first applied the FELA statute of limitation to a case involving an occupational disease. *Urie* involved a railroad employee who had contracted silicosis from continuous inhalation of silica dust blown into locomotives on which the employee had been working for 28 years. Rejecting the contention that the statute of limitations began to run when Urie first contracted silicosis, the court stated:

> If Urie were held barred from prosecuting this action because he must be said, as a matter of law, to have contracted silicosis prior to November 25, 1938, it would be clear that the federal legislation afforded Urie only a delusive remedy. It would mean that at some past moment in time, unknown and inherently unknowable even in retrospect, Urie was charged with knowledge of the slow and tragic disintegration of his lungs; under this view Urie's failure to diagnose within the applicable statute of limitations a disease whose symptoms had not yet obtruded on his consciousness would constitute waiver of his right to compensation at the ultimate day of discovery and disability.
>
> . . . .
>
> We do not think the humane legislative plan intended such consequences to attach to blameless ignorance. . . . "[C]onsequently the afflicted employee can be held to be 'injured' only when the accumulated effects of the deleterious substance manifest themselves . . . ."

337 U.S. at 169-70, 69 S. Ct. at 1024-25 (quoting *Associated Indemnity Corp. v. Industrial Accident Commission*, 124 Cal. App. 378, 12 P.2d 1075 (1932)).

Later in *United States v. Kubrick*, 444 U.S. 111, 100 S. Ct. 352, 62 L. Ed. 2d 259 (1979), a medical malpractice case brought under the Federal Tort Claims Act, the U.S. Supreme Court elaborated on the rule announced in *Urie*. In 1968, Kubrick, a veteran, was treated with neomycin at a veteran's hospital for an infection. In 1969, Kubrick's private physician

informed him that it was highly possible that the hearing loss was the result of the neomycin treatment. Another of Kubrick's private physicians, in June 1971, told him that neomycin had caused his injury and should not have been administered. In 1972, Kubrick filed suit under the Federal Tort Claims Act, alleging that he had been injured by negligent treatment at the VA hospital. A provision of the Federal Tort Claims Act, § 28 U.S.C. § 2401(b), bars any tort claim against the United States unless the claim is presented in writing to the appropriate federal agency "within two years after such claim accrues." The Court in *Kubrick* stated: "The issue in this case is whether the claim 'accrues' within the meaning of the Act when the plaintiff knows both the existence and the cause of his injury or at a later time when he also knows that the acts inflicting the injury may constitute medical malpractice," 444 U.S. at 113, 100 S. Ct. at 355, and then stated:

> We are unconvinced that for statute of limitations purposes a plaintiff's ignorance of his legal rights and his ignorance of the fact of his injury or its cause should receive identical treatment. That he has been injured in fact may be unknown or unknowable until the injury manifests itself; and the facts about causation may be in the control of the putative defendant, unavailable to the plaintiff or at least very difficult to obtain. The prospect is not so bleak for a plaintiff in possession of the critical facts that he has been hurt and who has inflicted the injury. He is no longer at the mercy of the latter. There are others who can tell him if he has been wronged, and he need only ask. If he does ask and if the defendant has failed to live up to minimum standards of medical proficiency, the odds are that a competent doctor will so inform the plaintiff.

444 U.S. at 122, 100 S. Ct. at 359. The Court concluded:

> We thus cannot hold that Congress intended that "accrual" of a claim must await awareness by the plaintiff that his injury was negligently inflicted. A plaintiff such as Kubrick, armed with the facts about the harm done to him, can protect himself by seeking advice in the medical and legal community. To excuse him from promptly doing

so by postponing the accrual of his claim would undermine the purpose of the limitations statute, which is to require the reasonably diligent presentation of tort claims against the Government.

444 U.S. at 123, 100 S. Ct. at 360.

*Urie* and *Kubrick*, when read together, supply a basis for a discovery rule regarding an action under the Federal Employers' Liability Act: Although a claimant may be unaware that a legal wrong has occurred, a negligence cause of action accrues when the claimant has knowledge, or, in the exercise of reasonable diligence, should have known of the critical facts of both an injury and the cause of the injury. Thus, the discovery rule relative to an FELA action was expressed in *Fries v. Chicago & Northwestern Transp. Co.*, 909 F.2d 1092, 1095 (7th Cir. 1990):

> [A] cause of action accrues for statute of limitations purposes when a reasonable person knows or in the exercise of reasonable diligence should have known of both the injury and its governing cause. . . . Both components require an objective inquiry into when the plaintiff knew or should have known, in the exercise of reasonable diligence, the essential facts of injury and cause.

See, also, *Bealer v. Missouri Pacific R. Co.*, 951 F.2d 38 (5th Cir. 1991) (a cause of action accrues when a plaintiff knows or should have known that the injury is work-related, i.e., when a plaintiff is aware of the critical facts concerning the injury and its causation); *Albert v. Maine Cent. R. Co.*, 905 F.2d 541 (1st Cir. 1990) (the statute of limitations begins to run when an employee becomes aware of the disease and its cause); *Townley v. Norfolk & Western Ry. Co.*, 887 F.2d 498 (4th Cir. 1989) (a cause of action for an occupational disease does not accrue when the injury is initially sustained, but, rather, when the plaintiff becomes, or should have become, aware of the injury; generally, this will be when the condition is diagnosed, unless it is shown that the plaintiff should have known at an earlier date that the plaintiff was injured); *Kichline v. Consolidated Rail Corp.*, 800 F.2d 356 (3rd Cir. 1986) (the statute of limitations begins to run when a plaintiff possesses sufficient critical facts

to put the plaintiff on notice that a wrong has been committed and that an investigation is necessary to determine whether redress is available); *Dubose v. Kansas City Southern Ry. Co.*, 729 F.2d 1026 (5th Cir. 1984) (the statute of limitations begins to run when a plaintiff should reasonably have been aware of the critical facts of injury and causation). See, also, *Fletcher v. Union Pac. R. Co.*, 621 F.2d 902, 906 (8th Cir. 1980), *cert. denied* 494 U.S. 1110, 101 S. Ct. 918, 66 L. Ed. 2d 839 (1981):

> In cases involving traumatic injury, when the symptoms are immediately manifested so that the employee is aware of the event causing the injury, the cause of action accrues upon the occurrence of the injury, regardless of whether the full extent of the disability is known at that time. . . . By the same token, with industrial diseases, where the symptoms are not immediately manifested, the cause of action does not accrue until the employee is aware or should be aware of his condition.

Although it is undisputed that Monaghan's tinnitus was medically confirmed in 1984, the testimony establishes that tinnitus or "ringing in the ears" may occur without a loss of hearing. Tinnitus, as a subjective condition, may occur independently of a noise-induced loss of hearing which is an objectively verifiable physical injury to cochlear cells in the inner ear. Although the separate conditions of tinnitus and noise-induced loss of hearing may exist simultaneously, there is no cause-and-effect relationship between the conditions. Moreover, tinnitus is not a noise-induced loss of hearing, the injury which, according to Dr. Carter, Monaghan suffered as the result of exposure to frequently recurrent loud noise over a protracted period. Therefore, Monaghan's knowledge that he was experiencing tinnitus cannot necessarily be equated with knowledge that he was gradually losing his hearing. In fact, Monaghan testified that he was unaware that he was gradually losing his hearing and that he acquired knowledge of his hearing loss only at the time of his examination by Dr. Carter in 1987. Thus, the evidence in Monaghan's case presented a two-fold question for the jury: When did Monaghan know that he had a hearing loss, or, more important under the circumstances, when, in the exercise of reasonable diligence,

should Monaghan have known that he had a hearing loss and attempted to identify the cause of that injury? Considering all the evidence, reasonable persons could answer the preceding questions differently on the basis of the evidence. One such permissible answer and conclusion was the jury's determination that Monaghan, sometime after June 13, 1985, and, therefore, within the 3-year period for filing an FELA action, acquired the information necessary for accrual of his cause of action against UP; hence, Monaghan timely filed his negligence action under the Federal Employers' Liability Act.

## CONCLUSION

Considering the facts in a light most favorable to Monaghan, we cannot conclude, as a matter of law, that, sometime before June 13, 1985, Monaghan knew, or should have known, that he had sustained a hearing loss and should have attempted to identify the cause of his injury. The district court appropriately overruled UP's motion for a directed verdict based on the statute of limitations in the Federal Employers' Liability Act and properly submitted Monaghan's case to the jury. Therefore, we affirm the district court's judgment entered on the verdict awarded to Monaghan.

AFFIRMED.